**In re McDONALD TRUCKING CO., INC., Alleged Debtor.**

**In re THOMAS COAL CO., INC., Alleged Debtor.**

**In re McDONALD LAND & MINING CO., INC., Alleged Debtor.**

Bankruptcy Nos. 86–2451—86–2453. Motion No. 87–1200.

United States Bankruptcy Court, W.D. Pennsylvania.

June 5, 1987.

On Motion for Reconsideration July 29, 1987.

Alan N. Bloch, U.S. Dist. Court, Pittsburgh, Pa., Carl A. Belin, Belin, Belin & Naddeo, Clearfield, Pa., for McDonald

Trucking Co., Inc., Thomas Coal Co., Inc., and McDonald Land & Mining Co., Inc.

Robert S. Bernstein, Bernstein And Bernstein, P.C., Pittsburgh, Pa., for Reserve Petroleum Co.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the Court is Movants' claim for damages, pursuant to 11 U.S.C. § 303(i), arising as a result of involuntary petitions in bankruptcy filed by Reserve Petroleum Company (hereinafter "Reserve"), and subsequently dismissed by this Court. After reviewing both the testimony offered at the hearing on this matter and the supplemental briefs submitted by the parties, we find that Reserve did in fact proceed in bad faith; however, due in large part to the speculative nature of several of the damage claims, only partial compensatory damages are appropriate. Further, we find that the bad faith in this case warrants an award of punitive sanctions.

## FINDINGS OF FACT

McDonald Trucking Co., Inc., Thomas Coal Co., Inc., and McDonald Land & Mining Co., Inc. (hereinafter "McDonald") are three separate and distinct corporate entities, owned in full or in part by their collective president, Fahy W. McDonald. Mr. McDonald entered into this self-employment in 1971 and during its course has employed as many as 140 individuals to process up to 15 million tons of coal annually. However, beginning in 1982, the coal industry, including McDonald, began to suffer economic setbacks.

McDonald had a long-standing business relationship with Mr. Jack Green, of Green Oil Company, to supply McDonald with diesel fuel. Although payment on the account was continually being made, the 1982–83 balance was steadily between $250,000.00 and $300,000.00. At some point during 1984, Green determined to give up the fuel business, advising McDonald that he was selling same to Reserve. Green introduced McDonald to Reserve, and at the urging of Green, McDonald agreed to use Reserve as its new diesel fuel supplier.

Mr. McDonald's undisputed testimony indicates that when Reserve took over from Green, McDonald's balance approximated $250,000.00. At some point during this relationship McDonald became current on its balance; however, by early 1985, the balance had again approximated $200,000.00. In the Spring of 1985, McDonald met with Reserve's Controller, who insisted that McDonald either immediately pay in full or collateralize this debt, if Reserve was to continue to supply McDonald with fuel. McDonald refused this demand, and began diverting its business to another supplier.

At approximately the same time, Green approached McDonald, stating that the arrangement he had made with Reserve was not working out, and he would be re-entering the business. McDonald agreed to give that portion of his business, not previously diverted to the other supplier, back to Green. McDonald was led to believe that Green was "taking back" his old business, as opposed to starting a new one.

In an effort to work out the $200,000.00 balance due and remaining, McDonald began to send checks of $5,000.00 per month to Reserve. Although the exact path that the checks followed is not clear, it appears that these monies were eventually transferred from Reserve to Green. Payments to Reserve ceased early in 1986; however, McDonald believed Reserve and Green to be the same as far as these repayments were concerned. As Green had made no further demand, McDonald testified he thought he could resume the preexisting relationship and begin repayment at a less structured pace. A payment was made in September of 1986—it was mailed directly to Green rather than to Reserve.

On September 12, 1986, counsel for Reserve wrote to McDonald, "requesting", in "demand-type" language, that McDonald furnish it with the names and addresses of other unsecured creditors by September 18, 1986, as Reserve planned to file an involuntary petition in bankruptcy against McDonald on September 22, 1986 "at high-noon". Counsel stated that said involun-

tary filing would occur, ". . . even if there is only one petitioning creditor, Reserve Petroleum." (McDonald Exhibit 1). McDonald testified that this letter was not received until after September 22, 1986, the date upon which the involuntary was filed.

McDonald responded to the involuntary petitions on October 14, 1986, with the filing of a Motion to Dismiss Creditor's Petition, stating that each alleged debtor had more than twelve (12) unsecured creditors; it provided a list of same, albeit without descriptions of the debts or exact amounts due thereon. On October 17, 1986, Reserve responded with the filing of a multi-purpose motion, requesting, among other things, sanctions against the alleged debtors for failing to include the descriptions and amounts. After several months of delay, Reserve sought to institute Discovery, and a hearing date of February 13, 1987 was set. In response thereto, McDonald provided the same list as that given in October; however, this list did include descriptions and amounts.

Immediately thereafter, Reserve sent solicitation letters to each of the listed creditors, whose names and addresses Reserve had already possessed for four (4) months. These letters urged the creditors to join in Reserve's petition. In that letter, Reserve stated the following:

> It does not matter how large or small your claim is, the claim of Reserve Petroleum, by itself, meets the requirements as to amount. All that we need help with is the number of creditors; we need more creditors to join into the Petition. (McDonald Exhibit 2).

On February 12, 1987, the day before the scheduled hearing on this involuntary matter, Reserve requested a thirty (30) day postponement, based upon the receipt of the aforementioned "complete" list, and the need for time to contact these creditors. The hearing was rescheduled for March 19, 1987. On March 6, 1987, after having been unsuccessful in its efforts to recruit two (2) additional creditors, Reserve filed a Motion To Join In Alleged Debtors' Motion To Dismiss the three involuntary petitions. A hearing was held on March 19, 1987, at

which time this Court directed that the three involuntary petitions be dismissed. 74 B.R. 474. Thereafter, testimony was taken on the issues of bad faith on the part of the petitioning creditor, Reserve, and if in fact bad faith be found, damages resulting therefrom.

## ANALYSIS

Involuntary bankruptcy proceedings are governed by 11 U.S.C. § 303, which states in pertinent part:

> (b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—
>
> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject on a bona fide dispute, or an indenture trustee representing such a holder, if such claims aggregate at least $5,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;
>
> (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549 or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $5,000 of such claims; . . .
>
> (i) If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—
>
> (1) against the petitioners and in favor of the debtor for—
>
> (A) costs;
>
> (B) a reasonable attorney's fee; or
>
> (C) any damages proximately caused by the taking of possession of the debtor's property by a trustee appointed under subsection (g) of this section or section 1104 of this title; or
>
> (2) against any petitioner that filed the petition in bad faith, for—

(A) any damages proximately caused by such filing; or

(B) punitive damages.

The filing of an involuntary petition by a creditor must be carefully scrutinized by the Court because such an action is extreme in nature and carries with it serious consequences to the alleged debtor, examples of which include loss of credit standing, interference with general business affairs, and public embarrassment. *In re Cates*, 62 B.R. 179 (Bankr.S.D.Tex.1986). *See also, In re R.N. Salem Corporation*, 29 B.R. 424 (D.C.S.D.Ohio 1983), wherein the court indicated that the Bankruptcy Code was created by Congress to act as a shield for debtors, rather than as a sword for creditors.

It is not necessary for this Court to find that the involuntary petition was filed frivolously or without merit in order to justify the award of costs and/or attorneys' fees upon dismissal of the case; nor is a finding of bad faith on the part of the petitioning creditor a condition precedent to the award of same. *In re Advance Press & Litho, Inc.*, 46 B.R. 700 (D.C.Colo.1984); *In re Allen Rogers & Company*, 34 B.R. 631 (Bankr.S.D.N.Y.1983); *In re Camelot, Inc.*, 25 B.R. 861 (Bankr.E.D.Tenn.1982).

■ The test for determining whether an involuntary petition has been filed in good faith is in many ways analogous to the obligations imposed under Bankruptcy Rule 9011 and Federal Rule 11, wherein the party is required to investigate both the facts and the law prior to the signing and submission of a pleading in the Court. Therefore, in order to find that an involuntary petition was filed in bad faith, the Court must look to the level of prefiling inquiry conducted by the creditor, and the purpose of creditor's filing. *In re Alta Title Company*, 55 B.R. 133 (Bankr.D. Utah 1985). This "bad faith" is measured by an objective standard. *Matter of Elsub Corporation*, 66 B.R. 189 (Bankr.D.N.J. 1986); *In re Wavelength, Inc.*, 61 B.R. 614 (B.A.P. 9th Cir.1986); *In re Godroy Wholesale Company, Inc.*, 37 B.R. 496 (Bankr.D. Mass.1984); *In re Grecian Heights Own-*ers' *Association*, 27 B.R. 172 (Bankr.D. Ore.1982).

It should be noted that no evidence was offered to indicate that the petitioning creditor considered any of the less radical and more traditional methods of debt collection, such as the filing of actions in state court.

■ Section 303(b) of the Bankruptcy Code states that the commencement of an involuntary case by a single creditor is appropriate only if the alleged debtor has fewer than twelve (12) creditors. *Basin Electric Power Cooperative v. Midwest Processing Company*, 47 B.R. 903 (D.C.N. D.1984), *aff'd* 769 F.2d 483 (8th Cir.1985). The evidence indicates that as early as September 12, 1986, ten (10) days prior to the filing of the involuntary petition, counsel to Reserve was aware of Movants' assertion that each corporation possessed more than twelve creditors. In its September 12 letter, Reserve's counsel requested that the Debtor supply the names and addresses of other unsecured creditors. This Court has been directed to no case or Code section stating that an individual being threatened with an involuntary bankruptcy is under any duty or obligation to supply the future petitioning creditor with the names and addresses of individuals who might be enticed to join. The appropriate Code sections and case law clearly place the burden of proving each and every element necessary to sustain this action upon the moving party.

■ It is interesting to note that in the various petitions filed by Reserve, it has conveniently omitted any reference to the total number of creditors for each Movant. At the hearing on this matter, counsel for Reserve stated that it was unable to verify the total number of creditors for each Movant, and that Movants failed to protect themselves by responding to the September 12 letter. Movants have testified that they were not in receipt of said letter until after the date of the involuntary filings; however, this Court finds that even if Movants were in possession of said letter, the Code places no duty upon them to so respond by providing Reserve with the information. The burden is clearly upon the petitioning creditor, and a refusal to provide an ele-

ment of the proof did not provide Reserve with an entitlement to file an involuntary petition, claiming fewer than twelve creditors, or making no claim at all.

This Court further finds that the lack of statement in the petition indicating the number of creditors was an attempt by Reserve to circumvent the Bankruptcy Code and Rules. This action is itself a measure of Reserve's intent and is sufficient to reach a finding of bad faith.

However, our finding reaches beyond that. Movants responded to the involuntary petition by filing a list of creditors' names and addresses. Thereafter, Reserve filed a multi-purpose motion wherein it requested sanctions against the Movants for noncompliance with Bankruptcy Rule 1003(d), requiring them to provide descriptions of the debts and amounts due and owing. Based on the following facts, we find that Movants' lack of compliance was *de minimus*. We are hard-pressed to understand why Reserve would file such a motion, given that its September 12 letter specifically requested *only* the names and addresses of all creditors. We assume that had such information been forthcoming, Reserve would have been satisfied. When Movants answered the involuntary petition, they merely supplied Reserve with the same information it had earlier requested. Reserve's dilatory action is aggravated by the recognition that it possessed said list for several months with no apparent use made thereof. It is also curious that Reserve would hold the Debtor to the description and amount requirements; Reserve admittedly possessed a claim of sufficient sum to meet the aggregate amount, requiring only the joinder of two de minimus creditors; its letter of February 11, 1987, advises Movants' other creditors that the amounts owed to them were of no consequence. Given these facts, this Court finds that Reserve is in fact guilty of proceeding in bad faith.

■ It has been held that damages which are either speculative or remote are not recoverable, even if a finding of bad faith in the filing has been made. *In re Camelot, Inc., supra.* The following

claimed damages are determined by this Court to be either too remote or speculative, and subsequently, are not compensable in this action:

1) *The "interference" with the rescheduling of Movants' debt with the National Bank of the Commonwealth* —Testimony was offered indicating that Movants were in the process of negotiating a "recasting" of their loan with the National Bank of the Commonwealth. At the time of the bankruptcy filing, Movants had not yet received any firm written commitment for such recasting. This Court is convinced that McDonald's relationship with its banker was adversely affected by this filing; however, without more definitive testimony, Movants are unable to prove that the recasting would have occurred absent the filing of the bankruptcy.

2) *A cap in the amount of escrow required on the surety bonds provided by Travelers Insurance Company* —Prior to the filing of the bankruptcy, Movants proved that Travelers had set a $1 million cap on the escrow fund for the surety bonds issued. Movants further averred that after the filing of the bankruptcy, Travelers removed that cap, indicating that it would be improvident to set a cap at that time. Through cross-examination, it was shown that lower caps had been set previously (an original cap of $500,000.00 and a second cap of $700,000.00). As the amount in escrow at the time of filing was approximately $900,000.00, and at the time of the hearing had reached only $925,000.00, it is impossible to predict with appropriate certainty, whether absent the bankruptcy filing, Travelers would have been satisfied with $1,000,000.00 in the escrow account, when that amount was reached. Therefore, the release of the cap is not relevant to a determination of compensatory damages.

3) *Claim of $75,000.00 in connection with loss of contracts for mineral and coal rights* —Movants have alleged an investment of over $57,000.00 in pre-paid royalties and $25,000.00 in bonding costs to secure an interest in certain mineral and coal rights. They have claimed that the

filing of the involuntary bankruptcy disrupted and destroyed delicate negotiations which were ongoing at the time of the filing; these negotiations would lead to contracts with adjacent landholders, which Movants needed in order to use the various coal and mineral rights. No evidence has been offered to show that the holders of the adjacent rights have withdrawn from negotiations; we cannot with appropriate certainty find that damages have in fact occurred. As negotiations of this type are tenuous even in the best situations, a finding of compensatory damages would not be appropriate.

The following damages are a direct result of the filing of the involuntary petitions in bankruptcy and therefore, are compensable:

1) *C.O.D. Status* —Movants stated that as a result of the filing of the involuntary petitions, they were placed on C.O.D. status by many of their creditors, and found it necessary to hire an additional employee to pick up and pay for supplies needed each day. On cross-examination the Controller acknowledged that some of Movants' trade creditors were supplying short-term, weekly credit arrangements, and that those creditors requiring C.O.D. payments did not anticipate that such status would continue indefinitely. Nevertheless, Movants were required to hire the additional employee, albeit for only one month, as a direct result of these languishing bankruptcy petitions. At trial Mr. McDonald and Mr. Young both testified that this additional employee earned about $4.00 per hour and worked approximately forty (40) hours per week. While Movants alleged additional costs associated with the payment of fringe benefits for said employee, no testimony was offered thereon. It appears therefore, that Movants consider such amounts to be de minimus in nature and this Court will do the same.

Movants also claim an estimated cost of $250.00 per week in additional purchasing/bookkeeping costs associated with the C.O.D. status. However, such costs have not been proven sufficiently for this Court to so award. Therefore, compensatory damage caused by the C.O.D. status totals $640.00.

2) *Tax Return* —The Commonwealth of Pennsylvania was scheduled to return approximately $32,000.00 to the Movants for tax overpayments from previous years. In January of 1987, Movants were informed that said refund could have been returned; however, because of the involuntary bankruptcy filings, the Commonwealth refused to release the money. While it is true that Movants will ultimately receive this money, they did in fact suffer a loss of its use from the time of its availability in January of 1987 until the actual dismissal of this case in March of 1987, amounting to damages of $526.44.

3) *McDonald's Wages* —Mr. McDonald candidly acknowledged that, as chief executive officer, his work week would continue until the work was completed. He openly advised that on many occasions he would work in excess of forty (40) hours per week. However, for the purposes of damage calculations in this case, we believe it is appropriate to determine his salary on the 40-hour-per-week basis. The use of any other hourly figure would be specious. Mr. McDonald claims that at least 48 total working hours were spent in repairing the damage done by the involuntary filings. Thereafter, a report was received by Dun & Bradstreet, thereby putting Movants' largest creditors on notice of the filings. A substantial amount of time was spent by Mr. McDonald with said creditors, both in attempting to resolve their concerns, and proceeding with work-outs of Movants' financial problems. While it is acknowledged that Mr. McDonald might have spent this same 48 hours managing his businesses in some capacity, the fact that these involuntaries caused his time to be spent specifically on repairing unnecessary damage, warrants reimbursement for same as damages thereon.

Mr. McDonald's annual salary is $90,-000.00. The rate of $52.65 per hour claimed by Mr. McDonald, representing wages and fringe benefits, is reasonable and will be allowed, creating damages of $2,527.20.

4) *Controller's Fees*—Mr. Barry Young, Movants' Controller, spent an even more extensive period of time attempting to smooth over the difficulties created by the filing of these involuntaries. Again, it is clear that Mr. Young often works more than 40 hours per week and that the hours spent in solving these problems would probably have been spent with the company on other matters. However, using the same reasoning as above, we find that basing Mr. Young's hourly rate on a 40–hour work week is reasonable and appropriate. Furthermore, it is clear that the one hundred ten (110) hours spent by Mr. Young in this matter, are the direct and absolute result of Reserve's improvident filing of these petitions. The hourly rate of $19.06, covering both wages and fringe benefits, is reasonable, causing damages of $2,096.60.

5) *Accountant's Fees*—Mr. Thomas Bernard, the Certified Public Accountant used by the Movants, testified as to the hours he spent working on this matter. This Court acknowledges that Mr. Bernard was testifying from sketchy notes he had made regarding the dates and times his work was conducted; however, Mr. Bernard did testify that the only work he did for the Movants was annual tax work, and given that these petitions were filed in September of 1986, the only work he would have been doing for Movants at that time would have related to the bankruptcy filings.

Given this testimony and its credibility, we find that the fees incurred by this Accountant, $1,290.00, are compensable.

6) *Attorney's Fees*—Counsel to McDonald testified that he is generally on retainer to these corporations. Be that as it may, it is clear that said attorney's retainer was for the purposes of handling Movants' general legal matters. As Reserve's actions caused an extraordinary type of legal complexity, not of the type anticipated when the retainer agreement was in fact executed, Counsel testified that he would in fact bill separately for these matters.

Defense of this matter required an expenditure of 27.95 hours; Counsel's hourly fee of $125.00 is a reasonable charge and is compensable, along with expenses incurred, at $3,507.75.

We must distinguish the aforementioned allowed compensation from those similar types of compensation permitted in the average fee petition submitted to this Court. We do not believe that the damages allowed, as above, fall under the stringent reporting requirements of 11 U.S.C. § 330. While we have titled these items Attorney's fees, Accountant's fees and Controller's fees, these items truly constitute damages. The law in Pennsylvania is clear that the fact finder may estimate a damage claim based on all relevant data, and that damages need not be proven to a mathematical certainty. *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 464 A.2d 1243 (1983).

We find that the records kept by the attorneys, accountants and other professionals in this case are sufficiently certain to allow an award of damages, though they might not be sufficient to withstand a § 330 examination.

Compensatory damages are awarded in the total amount of $10,587.99.

Section 303(i) allows for the imposition of punitive damages to deter repeat conduct and to punish the wrongdoer. *In re Godroy Wholesale Company, Inc., supra; In re Camelot, Inc., supra.* Such damages may be assessed against petitioning creditors who proceed in bad faith, even if they have done so in reliance on counsel for the acts which result in the exhibited bad faith. *In re Wavelength, Inc., supra.*

■ This Court believes that the litany of activities performed by Reserve, through its counsel, is abhorrent and deserving of sanction. The manner in which it has proceeded in this case, from the very beginning, when threatening Movants with the filing of the involuntary petitions, knowing it did not have the requisite number of petitioning creditors, is specifically the type of tactic which Congress and this Court intend to obviate. Reserve's further delay tactics, both in allowing significant time passage before bringing additional actions in this case, and in requesting a thirty

(30) day postponement of the dismissal hearing on the eve of same, only to join in that dismissal request one month later, have caused Movants to suffer needlessly and at length for an action which this Court deems was beyond their control.

There is no means by which this Court can restore Movants to their prior positions. However, in an effort to arrest this habit of careless filing of involuntary petitions, we find it appropriate to levy punitive damages of $500.00, or approximately five percent (5%) of the total compensatory damage award. This action is taken with the hope that it will deter future behavior of this type.

An appropriate Order will be issued.

## ORDER OF COURT

AND NOW, at Pittsburgh in said District this 5th day of June, 1987, in accordance with the foregoing Memorandum Opinion of this same date, it is hereby ORDERED, ADJUDGED and DECREED that Judgment is entered against Reserve Petroleum Company in the following amounts:

| | |
|---|---|
| Compensatory damages | $10,587.99 |
| Punitive damages | 500.00 |
| Total | $11,087.99 |

## MEMORANDUM OPINION

### On Motion For Reconsideration

Presently before the Court is what we have captioned a *Motion For Reconsideration,* which comes about as a result of the following scenario:

On June 5, 1987, this Court, after notice and hearing, entered a Memorandum Opinion and Order of Court in the above-captioned matters, dismissing the Involuntary Petitions and finding bad faith on the part of the Petitioning Creditor, Reserve Petroleum Company (hereinafter "Reserve"). An assessment was made against Reserve for both compensatory and nominal punitive damages.

Reserve's counsel filed Notices of Appeal of that Order on June 15, 1987, at 3:52 p.m. Thereafter, on June 17, 1987, Mr. Joseph D. Lawrence, Treasurer and Chief Financial Officer of Reserve, drafted and sent a pejorative letter to this Court; said letter being docketed with this Court on June 19, 1987. Attached to this castigating document which indicted all present members of this bench, Mr. Lawrence enclosed a copy of a "letter" on McDonald Land & Mining Co., Inc.'s letterhead, which was lascivious, profane and reprehensible.

In his admonition to the Court, Mr. Lawrence stated that the "enclosed letter" was received by Reserve from McDonald. Upon consideration of Mr. Lawrence's letter, in an effort to be charitable, we determined same to be a Request for Reconsideration, as opposed to a censure or a threat; this Court entered an Order on June 20, 1987, scheduling a hearing on said Reconsideration for July 20, 1987. [Completion and/or perfection of the Appeal occurred June 26, 1987].

Prior to said hearing, counsel to Reserve petitioned for a vacation of this Court's June 20, 1987 Order to the District Court Judge assigned the Appeal from our June 5, 1987 Order.

On July 16, 1987, said District Court Judge entered an Order remanding this matter and authorizing this Court's exercise of jurisdiction in proceeding with said re-hearing, and staying the appellate proceedings pending our resolution of the instant matter. Based upon said Order, this Court heard this matter on July 20, 1987, and herein provides the following supplement to the Opinion of June 5, 1987.

Mr. Lawrence testified at this re-hearing and provided the Court with various salient facts and opinions as to his actions. Mr. Lawrence alleges that:

1) The remonstrance sent to this Court was an expression of frustration, the result of having been an unsecured creditor in several cases filed in the Western District of Pennsylvania, including but not limited to: *Eola Coal Corporation,* Case No. 82–1551; *Benjamin Coal Com-*

*pany, Inc.* Case No. 84–2081; *Eazor Special Services,* Case No. 84–130; *Wendon Oil Company,* Case No. 85–317; *Wheeling-Pittsburgh Steel Corporation,* Case No. 85–793; and *Norsub, Inc.,* Case No. 85–1832. (It is worthy to note that this member of the Court heard and determined only the instant case, wherein Mr. Lawrence's epistle indicts all other members of this bench, present and some deceased.)

2) Reserve has a history of being a Petitioning Creditor in the Bankruptcy Court. A cursory investigation uncovered the following cases, wherein Reserve used the same tactic: *Norsub, Inc.,* Case No. 85–1832 and *Blue & White Bus Lines, Inc.* Case No. 85–2385.

3) Mr. Lawrence, as a result of having participated in a substantial number of bankruptcy cases, understood that any testimony, opinion and/or evidence relating to this case was to be offered at the March 19, 1987 hearing on the dismissal of these involuntary petitions.

4) Mr. Lawrence was present at the March 19th hearing and chose not to testify.

5) The "letter" allegedly emanating from McDonald Land & Mining Co., Inc. was in Lawrence's possession at the time of the March hearing; however, a decision was made by Lawrence and his counsel at that time not to present same.

6) Mr. Lawrence waited until after this Court had entered its Order to present said letter, along with his especially odious introduction thereto.

7) Mr. Lawrence states that he alone authored the denigrating letter of June 17, 1987 and sent same, without advising counsel thereof. Counsel supplied the names and addresses of the Third Circuit and District Court judges.

8) Mr. Lawrence asserted several times that the Bankruptcy Court for the Western District of Pennsylvania is a "debtor's court", where unsecured creditors are considered a "bother", and receive "high-handed treatment".

9) Mr. Lawrence knew the dispatch of June 17, 1987 would be considered contentious, but after submitting it to Reserve's president for approval, transmitted same to this Court and to other selected jurists on the District Court for the Western District of Pennsylvania, as well as the Third Circuit Court of Appeals.

10) Mr. Lawrence intended his indictment to operate as a general influence upon this Court in all of its future cases.

Mr. Lawrence provided the Court with the following information as to the "letter" allegedly prepared and delivered by McDonald:

1) The acrimonious letter in question was "found" by Mr. Lawrence in Reserve's "McDonald" file when he came to Reserve as Treasurer and Chief Financial Officer in the spring of 1985. He has no independent first-hand knowledge of its origin.

2) Mr. Lawrence testified that he was advised by the then Credit Manager that the letter was received by her, and a former Credit Assistant, from McDonald, at a payment negotiation meeting.

3) This former Credit Manager was not brought to Court in order to testify and be judged as to credibility. The Court was advised that although thirty (30) days' notice of this hearing was given, counsel did not make the necessary provisions to have this individual present.

4) The Court is advised that the former Credit Assistant is presently employed in this city, but was similarly not brought forward to testify in order that the Court could judge her credibility.

5) Mr. Lawrence never considered the possibility that the "letter" was a "creation" by someone other than McDonald Land & Mining Co., Inc.

6) At the time Mr. Lawrence found the letter, he determined that it would be appropriate to keep it, in case it would be necessary to brandish it at some time in the future.

Mr. McDonald testified as follows:

1) He categorically denied the unsubstantiated testimony of Reserve and he testified that he personally never produced or delivered the letter in question to anyone, nor did he ever direct anyone else to do so.

2) He directed his controller, Mr. Young, to interrogate all employees as to their knowledge of said letter, and directed that all typewriters be tested to determined if the offensive document originated therefrom.

Mr. Young substantiated Mr. McDonald's requests and testified to the following:

1) He did not create or send said letter to anyone, nor did he direct anyone else to do so.

2) He showed the letter to every employee, all of whom verified that they had not manufactured or sent same.

3) The entire text of this letter was typed on every typewriter in McDonald's offices; none of the exemplars was matched to the letter in question.

4) Since 1984, none of the typewriters have been replaced or destroyed.

Even if viewed in the light most favorable to Reserve, this additional testimony further substantiates this Court's original determination that Reserve has acted in bad faith in these cases. Reserve has used these involuntary bankruptcy proceedings as a club with which to beat these alleged debtors into submission, much the same way it retained the "McDonald letter" for future improper use.

Mr. Lawrence sent the June 17, 1987 letter to this Court, realizing its contentious and contemptuous nature, and sent copies to several other members of the judiciary, hoping to wield a generally creditor-oriented influence over this Court in particular, and the Bankruptcy Court for the Western District of Pennsylvania in general.

Mr. Lawrence further exhibited manifest bad faith in presenting the "McDonald" letter ex parte to this Court, without offering the alleged creator an opportunity to confront and respond to its/his accusers.

This "best light" is not, however, this Court's view of the case. We do not find Mr. Lawrence's ex parte explanation of the "McDonald" letter's existence to be credible, nor are we inclined to do so, knowing that the only two parties having such first-hand knowledge were not presented for substantiation. We do not believe that the letter was the creation of any party at McDonald, and are truly surprised that Mr. Lawrence never once considered that the letter might be "bogus".

We further find the acerbic analogies presented in Mr. Lawrence's own venomous letter to be equally maligning to those presented in the "McDonald" letter, and find the entire matter to be more than disparaging of McDonald's reputation and character. All this, without first confronting McDonald as to the veracity of the document in question: a stronger case for bad faith might be difficult to imagine.

This Court has previously included a modest sum in its Order relating to punitive damages. The letter in question casts a new and more direct light upon the issue of "bad faith", as well as the adverse effect of same upon McDonald. Utilizing ultimate moderation, this Court declines to increase the punitive damage award to the level that the new evidence warrants. Motion For Reconsideration denied.

An appropriate Order will be issued.

### ORDER OF COURT

AND NOW at Pittsburgh in said District this 29th day of July, 1987, in accordance with the foregoing Memorandum Opinion of this same date, it is ORDERED, ADJUDGED and DECREED that the Motion For Reconsideration is DENIED. This Court's Order of June 5, 1987, is REAFFIRMED, granting judgment in favor of McDonald Trucking Co., Inc., Thomas Coal Co., Inc. and McDonald Land and Mining Co., Inc. as follows:

| | |
|---|---|
| Compensatory Damages | $10,587.99 |
| Punitive Damages | 500.00 |
| Total Damages | $11,087.99 |