**In re K.P. ENTERPRISE, Debtor.**

**Bankruptcy No. 91–10521.**

United States Bankruptcy Court,
D. Maine.

Jan. 2, 1992.

Alton C. Stevens, Marden, Dubord, Bernier & Stevens, Waterville, Me., for Richard W. Belisle.

Peter S. Plumb, Murray, Plumb & Murray, Portland, Me., for K.P. Enterprise.

## MEMORANDUM OF DECISION

JAMES B. HAINES, JR., Bankruptcy Judge.

On June 25, 1991, Richard W. Belisle ("Belisle"), a former owner of KP Enterprise ("KP"), filed an involuntary bankruptcy petition against it. KP timely responded, seeking dismissal and damages and asserting that Belisle, as a solitary petitioner, could not commence an involuntary proceeding because its creditors numbered more than twelve.[1] KP also filed a counterclaim alleging Belisle's breach of an indemnity agreement regarding certain workers' compensation insurance premium obligations.

Following an evidentiary hearing I entered oral findings of fact and conclusions of law and dismissed the involuntary bankruptcy petition, retaining jurisdiction to adjudicate KP's § 303(i)[2] claims.

Today I hold that KP is entitled to an award of fees and costs under § 303(i)(1); that Belisle filed the involuntary petition in bad faith; that KP is entitled to compensatory damages under § 303(i)(2); that circumstances do not warrant a punitive damages award; that KP may not press its claims for breach of the indemnity agreement here; and that Belisle may not exercise setoff against KP's § 303(i) award.[3]

## FACTS

Before June 1, 1990, Belisle and his wife owned all of the stock of KP, a Maine corporation engaged in the scrap metal and used car parts business in Vassalboro, Maine. On that date their KP stock was sold to Recycled Metals Company, an entity owned by G. Edwin Smith, III ("Smith"). Smith became KP's president and chief operating officer.

The Belisles were paid $1,000,000.00 at closing.[4] KP owed Belisle another $500,000.00 under the terms of what were ostensibly deferred compensation, non-competition and consulting agreements. KP was to satisfy Belisle through a $50,000.00 installment payment due December 1, 1990, and monthly payments of $8,333.33 thereafter. The $500,000.00 obligation was secured by a security interest in KP's accounts, inventory and equipment and a mortgage of its real estate.[5] In addition, and without providing security, KP agreed to pay Belisle one percent of its monthly gross receipts for six years. Belisle's right to payment of the $500,000.00 obligation

---

1. KP's answer and motion to dismiss were accompanied by a list of creditors. *See* F.R.Bankr.P. 1003(b).

2. Unless otherwise indicated, all citations to statutory sections and references to the "Bankruptcy Code" or the "Code" are to the Bankruptcy Code of 1978, as amended, 11 U.S.C. § 101 *et seq.* (1991).

3. This memorandum sets forth my findings of fact and conclusions of law. *See* F.R.Bankr.P. 7052.

4. The "net" to Belisle, after retiring bank debt, was approximately $750,000.00.

5. Smith did not guarantee KP's obligations to Belisle.

was subordinated to KP's obligations to Fleet Bank of Maine ("Fleet"), which provided KP with post-sale financing. Belisle's security interest and mortgage were subordinated to coextensive security KP granted to Fleet. In addition to other restrictions imposed by the bank, the subordination agreement set forth financial tests that KP had to pass before it could pay Belisle installments on his $500,000.00 claim.

After June 1, 1990, the relationship between Smith and Belisle deteriorated. Just weeks after the sale, Smith asked that Belisle withdraw from all involvement with KP, including consulting activities. Belisle testified that Smith next told him that KP had been purchased at too high a price and that Belisle would have to "fight for every nickel" owed him.

Smith testified that after he informed Belisle that KP could not pass the bank's financial performance tests and, thus, that it could not make the installment payments commencing December 1, 1990, on schedule, Belisle initiated a campaign of harassment designed to extort payment or to put the company out of business. Smith complained that, as part of the campaign, Belisle brought KP's operations under the scrutiny of state environmental authorities; engineered a "sting" in which employees sold KP stolen copper and then informed the local sheriff; encouraged revocation and discouraged reinstatement of KP's municipal operating permit; breached the indemnity agreement; and repeatedly made other threats. In the spring of 1991, Belisle purchased the assets of a nearby auto parts enterprise, allegedly violating his non-competition covenants. Thus, KP asserts that Belisle launched a vendetta designed to assure KP's destruction, culminating in the involuntary bankruptcy filing.

In the meantime, KP defaulted on its obligations to Fleet, missing the payment due on January 1, 1991. Under mounting pressure from the bank, Smith attempted to locate a purchaser for the business while he liquidated inventory. Although Belisle expressed an interest in re-acquiring the business, he made no offer. No buyer surfaced.

During early 1991 KP's troubles were not limited to its defaults with Fleet and its non-payment of Belisle. Its workers' compensation insurance carrier billed it for over $40,000.00 in premium arrearages for coverage before June 1, 1990. Although Belisle had agreed to indemnify KP for such obligations, he did not respond to Smith's request that he pay the insurer directly. As a consequence, the carrier terminated coverage on May 27, 1991. If that were not enough, the Vassalboro Planning Board discontinued the company's operating permit on June 20, 1991, citing environmental problems at the site.

Fleet foreclosed and scheduled an auction sale of KP's assets for June 26, 1991. On the afternoon of June 25, 1991, Belisle filed an involuntary Chapter 7 bankruptcy petition against KP, derailing the auction. Fleet obtained relief from stay on July 22, 1991, and auctioned KP's assets on September 12, 1991. After the sale, Fleet was left with a $321,948.40 deficiency claim.

Belisle did not attempt to enlist other petitioners before the hearing on KP's motion to dismiss. Because too few creditors had joined to sustain it, the petition was dismissed.[6]

KP now seeks judgment against Belisle for costs, fees, damages and punitive damages. Belisle urges that KP be denied any recompense.

## DISCUSSION

1. *Section 303(i) Remedies.*

■ KP's entitlement to judgment rests on 11 U.S.C. § 303(i).[7] The statute is clear

---

**6.** Order dated September 25, 1991. *See* 11 U.S.C. § 303(b)(1).

**7.** Section 303(i) of the Code provides as follows:
   If the court dismisses a petition under this section other than on consent of all petition-

ers and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—
   1. against the petitioners and in favor of the debtor for—
   (A) costs; or

that, whether or not an involuntary petition is filed in bad faith, the court may grant judgment against unsuccessful petitioners for costs and attorney's fees. *In re Godroy Wholesale Co., Inc.,* 37 B.R. 496, 499 (Bankr.D.Mass.1984). *Cf. In re West Side Community Hospital, Inc.,* 112 B.R. 243, 257 (Bankr.N.D.Ill.1990) (commenting that costs and fees are most often awarded where there has been a finding of bad faith); *In re Fox Island Square Partnership,* 106 B.R. 962, 966 (Bankr.N.D.Ill.1989) (noting that, although bad faith usually accompanies fee award, § 303(i) authorizes such an award even in good faith circumstances). The decision whether to award costs and fees is committed to the court's discretion. *In re Reid,* 854 F.2d 156, 159 (7th Cir.1988); *In re Nordbrock,* 772 F.2d 397, 400 (8th Cir.1985); *In re Better Care, Ltd.,* 97 B.R. 405, 410 (Bankr.N.D.Ill.1989).

Use of the word "or" in § 303(i) was not intended to limit the court's award to only one of the listed alternatives. 11 U.S.C. § 102(5). *See In re West Side Community Hospital, Inc.,* 112 B.R. at 257. The debtor who successfully defends an involuntary petition may obtain an award of costs and fees against the petitioners and, if a petitioner brought the petition in bad faith, the debtor may, in addition, have damages and punitive damages from it. 11 U.S.C. § 303(i). *See In re Reid,* 854 F.2d at 160; *In re Fox Island Square Partnership,* 106 B.R. at 966; *In re Better Care, Ltd.,* 97 B.R. at 410.

2. *Fees and Costs.*

Some hold that, other than in limited circumstances, one who successfully defends against an involuntary petition should, at the very least, be awarded the costs and fees expended in its defense. *In re Leach,* 102 B.R. 805, 808 (Bankr.D.Kan. 1989) (award of costs and fees is "routine-ly" contemplated under § 303(i)(1)); *In re Anderson,* 95 B.R. 703, 705 (Bankr. W.D.Mo.1989) (denial of costs and fees may be appropriate in "limited circumstances"). Others have commented that fees and costs are seldom awarded in the absence of bad faith. *In re West Side Community Hospital, Inc.,* 112 B.R. at 257; *In re Fox Island Square Partnership,* 106 B.R. at 966.

■ Because I consider that fairness requires it and that § 303(i) contemplates it, I adopt the view that unsuccessful petitioners should generally expect that fees and costs will be awarded to the debtor. The rule, however, is not hard and fast. Each request for an award of fees and costs invokes the court's discretion, informed by such factors as the reasonableness of the petitioners' actions, their motivation and objectives, and the merits of their view that the petition was proper and sustainable. *In re Reid,* 854 F.2d at 160.

■ Considering these factors, a fees and costs award is appropriate here. The filing was patently unreasonable. Belisle's view that it would realize his objectives was wrongheaded at best.[8] He neither investigated nor appreciated his limited prospects for obtaining an order for relief on his solo petition.

Belisle urges the court to deny even an award of costs and fees because, at the time he sold KP to Smith in June 1990, and in the period immediately preceding the sale, the company had fewer than twelve "creditors" as defined by pertinent Code provisions.[9] Whatever relevance the number of KP's creditors over a year earlier may have, Belisle conceded that he did not explore the issue before filing and that by December 1991 he knew that the company was in dire financial straits and would likely fail. It should have occurred to him that

---

(B) a reasonable attorney's fee; or
2. against any petitioner that filed the petition in bad faith, for—
(A) any damages proximately caused by such filing; or
(B) punitive damages.

**8.** The reasonableness of the filing, its relation to attaining Belisle's objectives, and Belisle's moti-

vation are addressed in detail in the discussion of bad faith, *infra.*

**9.** *See* 11 U.S.C. § 303(b)(2). Although June 1990 documents included a listing numbering KP's creditors at 16, four were employees, and one was an accountant whom Belisle, not KP, was to pay.

KP's creditor constituency had grown beyond twelve.

I cannot conclude that Belisle's initiation of an involuntary proceeding as the sole petitioning creditor was so justifiable as to present one of those "limited circumstances" in which an award of fees and costs should not be made. *In re Anderson,* 95 B.R. at 705.

### a. Attorney's Fees.

KP has submitted an attorney's fees itemization for defense of the involuntary petition through trial in the total amount of $13,430.00.[10] KP shall, within ten days from the date of the order accompanying this memorandum, file a statement that the parties have or have not agreed on a fees award. Absent agreement, I will evaluate the reasonableness[11] of KP's counsel's fees and make the award. KP shall submit its application for a fees award in the format required by F.R.Bankr.P. 2016 and Me. Bankr.R. 2016 within five days after filing notice of disagreement. Belisle may, within five days thereafter, file a response. The fees award will enter without further hearing.

### b. Costs.

■ KP is entitled to an award of costs for the same reasons as justify an award of fees. It asks for a total of $1,392.85 for witness fees, reporting services and transcription costs incurred in discovery. Such expenses are appropriate and will be assessed as costs.

KP also argues that its "costs" include all the expenses it incurred in the period between the date of the aborted auction and the date of the actual auction, including prorated real estate taxes, repairs and maintenance, security guard services, expenses associated with the first auction, Fleet's legal fees (added to KP's obligation

under the terms of its loan) and accrued interest. Reviewing these claims, I conclude that they represent damages caused by the involuntary bankruptcy filing, rather than costs. As such, they can only be awarded pursuant to § 303(i)(2) upon a finding of bad faith. The structure of § 303(i), which groups costs with attorney's fees, and the meaning customarily attributed to the term "costs" lead to that conclusion.

First, costs and fees are addressed in § 303(i)(1), while damages are addressed in § 303(i)(2). To treat the items sought by KP as costs would leave the separate category of damages largely meaningless. Moreover, other sections of the Bankruptcy Code, as well as pertinent procedural rules, associate costs with attorney's fees in a fashion that discloses an intent to restrict them to costs associated with legal representation. *See e.g.* 11 U.S.C. §§ 362(h), 523(d). *See also* F.R.Bankr.P. 7054, F.R.C.P. 54.

The cases assessing awards of fees, costs and damages under § 303(i) leave no room for doubt that the costs recoverable under § 303(i)(1) are the costs of defending against the involuntary petition. *See In re Fox Island Square Partnership,* 106 B.R. at 966–67; *In re Leach,* 102 B.R. at 808; *In re Anderson,* 95 B.R. at 704–05; *In re Exchange Network Corp.,* 85 B.R. 128, 131–32 (Bankr.D.Colo.1988); *In re Johnston Hawks, Ltd.,* 72 B.R. 361, 365 (Bankr. D.Haw.1987), *aff'd,* 885 F.2d 875 (9th Cir. 1989); *In re Godroy Wholesale Co., Inc.,* 37 B.R. at 499.

Thus, the "costs" to be awarded to KP are limited to the costs associated with defending the involuntary petition, including the $1,392.85 already itemized and such additional expenses as may be tallied and

---

10. KP Exhibit 7.

11. In *In re Better Care,* 97 B.R. at 413, the court noted that, "while Section 330 requires that attorney's fees be based upon actual and necessary legal services, Section 303 only requires that such fees be reasonable." The court premised this statement on the observation that

"[f]ees, as assessed under Section 303, are merely an element of damages." *Id.* Under § 303(i), this court will focus its review of fees sought on reasonableness. *Cf. In re Rheam of Indiana, Inc.,* 133 B.R. 325 (E.D.Pa.1991) (discussing factors relating to fee awards).

considered as part of the attorney's fees application process.[12]

### 3. Bad Faith and Damages.

#### a. The Bad Faith Standard.

Before considering whether I should exercise my discretion to award damages and, possibly, punitive damages, I must determine whether Belisle crossed § 303(i)(2)'s bad faith threshold. The factors considered in determining bad faith under § 303(i)(2) have yet to be annunciated in this district.

As others have observed, neither the Code nor its legislative history provides guidance regarding the content of the bad faith standard. The notion was left for development in the courts. *In re Turner*, 80 B.R. 618, 622 (Bankr.D.Mass.1987) (drafters gave the courts an "empty chal-

ice" to be filled by case law development). *See also In re Fox Island Square Partnership*, 106 B.R. at 967–68 (collecting cases); *In re Wavelength, Inc.*, 61 B.R. 614, 619 (9th Cir. BAP 1986).

Tests applied to resolve the factual question[13] of bad faith have been categorized variously as the "improper use" test[14]; the "improper purpose" test[15]; the "objective" test[16]; the "subjective" test[17]; and the "combined" or "Rule 9011" test.[18] One court, considering the pertinent tests, has described the essence of the exercise as applying "the nose test."[19] Nosing about for bad faith, the fact-finder should attempt to ensure first, that it sniffs all the right places and, second, that it doesn't put its nose where it doesn't belong.

■ In selecting a model appropriate to detect bad faith's scent, I agree with the

---

12. KP Exhibit 7 discloses expenses for facsimile transmissions, travel expenses, postage, long distance telephone calls and photocopying. Such reimbursement requests are appropriately considered in connection with review of associated legal services.

13. The presence or absence of bad faith is a question of fact. *In re Wavelength, Inc.*, 61 B.R. at 620; *In re·Advance Press & Litho*, 46 B.R. 700, 704.

14. The "improper use" test finds bad faith when a petitioning creditor uses involuntary bankruptcy procedures in an attempt to obtain a "disproportionate advantage" for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interests in a different forum. *See, e.g., In re Better Care, Ltd.*, 97 B.R. at 411 (attempt to gain corporate control and to reduce guaranty obligation); *In re F.R.P. Industries, Inc.*, 73 B.R. 309, 313 (Bankr.N.D.Fla.1987) (attempt to take over business); *In re Wavelength*, 61 B.R. at 622 (attempt to control corporation). It has also been applied to find bad faith when the particular misuse involved is employing the Bankruptcy Code as a collection tool. *See, e.g., In re Nordbrock*, 772 F.2d at 399 (collecting cases); *Basin Electric Power Cooperative v. Midwest Processing Co.*, 769 F.2d 483, 487 (8th Cir.1985), cert. den., 474 U.S. 1083, 106 S.Ct. 854, 88 L.Ed.2d 894 (1986); *In re SBA Factors of Miami, Inc.*, 13 B.R. 99, 100 (Bankr.S.D.Fla.1981).

15. The "improper purpose" test focuses on the petitioner's motivation for filing an involuntary petition, and finds bad faith when those motives are inappropriate. *See, e.g., In re Salmon*, 128 B.R. 313, 315 (Bankr.M.D.Fla.1991) (referring to

motive to "ruin and destroy" debtor); *In re Better Care, Ltd.*, 97 B.R. at 411 (malicious attempt to shut down business).

16. The "objective test" attempts to gauge good or bad faith by asking the question whether a reasonable person would have initiated an involuntary bankruptcy action under the existing circumstances. *See e.g., In re Midwest Processing Co.*, 41 B.R. 90, 102 (Bankr.D.N.D.1984); *In re Grecian Heights Owners' Ass'n*, 27 B.R. 172, 173 (Bankr.D.Or.1982).

17. The "subjective test" is a close kin, if not a clone, of the "improper purpose" test, *supra*, n. 15. It, too, looks to the petitioning creditor's subjective motivation for filing and considers the appropriateness of that motivation for initiating bankruptcy proceedings. *See In re Fox Island Square Partnership*, 106 B.R. at 967 (discussing subjective test).

18. The "combined" or "two part" test considers both motivation for and objective reasonableness of the petitioner's actions. Some cases combine the objective and subjective tests, most often utilizing F.R.Bankr.P. 9011 as an analytical model. *See e.g., In re Petralex Stainless, Ltd.*, 78 B.R. 738, 743 (Bankr.E.D.Pa.1987); *In re McDonald Trucking Co., Inc.*, 76 B.R. 513, 517 (Bankr.W.D.Pa.1987). Others do the same while employing the "improper use" and "improper purpose" terminology. *See e.g., In re Better Care, Ltd.*, 97 B.R. at 411–12.

19. *See In re Better Care, Ltd.*, 97 B.R. at 409, in which Judge Katz is quoted as stating: "If it smells like bad faith, it's got to be bad faith. I think the petitioning creditors in this case failed all the tests, whichever one you apply."

analysis of *In re Turner*, 80 B.R. at 622–23. The various tests overlap, exploring different facets of the same concept. Objective and subjective factors should be considered in the § 303(i)(2) context. To apply § 303(i)(2) in a fashion consistent with other instances in which the question of bad faith is considered in bankruptcy and commercial contexts,[20] and to ensure that all pertinent indicia of bad faith are explored, Rule 9011's model provides the comprehensive olfactory guide.[21] *See, e.g., In re West Side Community Hospital, Inc.*, 112 B.R. at 258; *In re Fox Island Square Partnership*, 106 B.R. at 967–68; *In re Better Care, Ltd.*, 97 B.R. at 411; *In re McDonald Trucking Co., Inc.*, 76 B.R. at 516. *Cf. In re Laclede Cab Co.*, 76 B.R. 687, 693 (Bankr.E.D.Mo.1987) (considering award against petitioners under § 303(i) and sanctions against counsel under Rule 9011).

Evaluating the evidence and determining bad faith through Rule 9011's lens must be understood for what it is. The rule itself may be utilized when § 303(i)(2) does not apply, such as where there has been a voluntary dismissal with universal consent[22] or where sanctions against counsel are sought.[23] Applying § 303(i)(2), Rule 9011 serves as a reference to assist in effectively implementing the statute. Employing Rule 9011 in this context neither restricts nor expands the statutory remedy.

### b. Applying the Standard.

Referring to Rule 9011's standard, I will consider whether Belisle made reasonable

inquiry of relevant facts and pertinent law before initiating this involuntary bankruptcy case; whether the involuntary petition's allegations were well grounded in fact; whether the request for involuntary bankruptcy relief was warranted by existing law or by a good faith argument for extension, modification or reversal of existing law; and whether the action was initiated for any improper purpose, such as harassment, delay or to increase costs. *See In re Fox Island Square Partnership*, 106 B.R. at 968; *In re Better Care, Ltd.*, 97 B.R. at 411–12; *In re Turner*, 80 B.R. at 623.

### i) *Did Belisle make reasonable inquiry of relevant facts and pertinent law before initiating the petition?*

Belisle should have known that KP had more than twelve creditors at the time he initiated the filing. He made no meaningful inquiry into the number of KP's creditors at or near the time he filed the petition. At the same time, Belisle acknowledged that he knew by late fall of 1990 that the business was unlikely to survive and that it continued to sustain substantial losses. Under such circumstances, Belisle's failure to at least attempt to find out whether KP had more than twelve creditors before he filed the petition was not reasonable.

### ii) *Was the involuntary bankruptcy petition well grounded in fact?*

The essential allegation of the involuntary petition was and, in the absence of the

---

20. *See In re Turner*, 80 B.R. at 623. *Cf.* Ponoroff & Knippenberg, *Legal Theory: The Implied Good Faith Filing Requirement: Sentinel of an Evolving Bankruptcy Court*, 85 Nw.U.L.Rev. 919, 925 (1991) (noting role of Rule 9011 in analysis of bad faith filing issues).

21. F.R.Bankr.P. 9011 provides, in pertinent part:

The signature of an attorney or a party constitutes a certificate that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information, and belief formed after reasonable inquiry it is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass, or to cause unnecessary delay, or needless increase

in the cost of litigation or administration of the case.

22. *See In re International Mobile Advertising Corp.*, 117 B.R. 154 (Bankr.E.D.Pa.1990).

23. Damages may be awarded against a "petitioner that filed the petition in bad faith." *See* 11 U.S.C. § 303(i), *supra*, n. 7. *See In re Walden*, 787 F.2d 174 (5th Cir.1986); *In re Fox Island Partnership*, 106 B.R. at 967 (statute does not provide for award against attorney). *See also In re Advance Press & Litho*, 46 B.R. at 705; *In re Grecian Heights Owners' Ass'n*, 27 B.R. at 173–74; *In re Ramsden*, 17 B.R. 59, 61 (Bankr. N.D.Ga.1981). *But see In re Turner*, 80 B.R. at 628 (addressing potential liability of counsel under Rule 9011 apparently in absence of a separate motion invoking the rule).

pre-filing appointment of a receiver had to be, that KP was generally not paying its debts as they became due. 11 U.S.C. § 363(h)(1). No determination has been made on that point. The petition was dismissed for lack of at least three petitioning creditors. 11 U.S.C. § 303(b)(1).

iii) *Was the involuntary petition warranted by existing law or by a good faith argument for a change in existing law?*

Had the merits of the petition been tried, a straightforward application of established law was all that was required. However, Belisle's objectives constituted an inappropriate basis for initiating involuntary Chapter 7 proceedings. Indeed, had the filing been successful, Belisle might well have lost far more than he could possibly have gained.[24]

iv) *Was the filing undertaken for an improper purpose, such as harassment, delay or an effort to increase costs to obtain advantage?*

Much of the parties' evidence focused on Belisle's motivation and conduct in the months preceding the bankruptcy filing. KP has characterized them as a campaign to extort payment. I do not accept the characterization.

Belisle contacted state environmental authorities because he was concerned that, as the prior owner, he might be held liable for environmental contamination at KP.[25] His actions before Vassalboro's planning board, too, stemmed from concern about his own potential liability for environmental contamination. Former KP employees testified that they reported KP's possible purchases of stolen cooper to local authorities out of concern that they might later be accused of improper conduct, not at Belisle's urging.

I reject Smith's depiction of meetings in late 1990 and early 1991 as events where Belisle threatened to put KP out of business if he were not paid. Belisle met with Smith and offered to assist in managing the business with the hope that KP could still be saved and that he might ultimately be paid.[26]

Other evidence of Belisle's alleged malice is equally flimsy. His refusal to pay KP's workers' compensation premium arrearages, although likely a contractual breach, was not an act of ill-will. Given that he was not being paid on schedule and that KP was liquidating inventory in an effort to postpone Fleet's foreclosure, one can understand Belisle's reluctance to write a $40,000.00 check to KP's insurance carrier in late April 1991.[27] Contrary to Smith's testimony, Belisle purchased the assets of another scrap dealer at Smith's suggestion, only after it was clear that KP would not survive the spring of 1991.

Other conduct aside, Belisle concedes that he initiated the involuntary bankruptcy to stay Fleet's auction. He argues that seeking delay was proper, however, in light of his view that, were KP's assets to be sold in more leisurely fashion, the sales would realize funds to apply to his subordinate, secured claim. Significantly, Belisle does not contend that a trustee could have realized value in excess of claims validly secured by KP's assets. Under such circumstances, a Chapter 7 trustee would likely have but one choice regarding KP's assets—to abandon them.[28]

Belisle's proper remedy was to protect his rights under state law as a junior secured creditor at Fleet's public sale of KP's assets. If his assumptions of value were correct, he could have bid, or encouraged

---

**24.** *See infra,* n. 33.

**25.** Two representatives of the Maine State Department of Environmental Protection corroborated Belisle's testimony on this point.

**26.** I do not credit the version of events set forth in KP Exhibit 108, ostensibly a transcript of Smith's dictated notes of his meetings with Belisle. The transcript contains Smith's self-serving conclusions about Belisle's conduct, together with hearsay and speculation.

**27.** At the time, KP was no longer conducting business in the usual course. Even after the insurance was cancelled, KP continued its liquidation efforts with the help of independent contractors.

**28.** *See* 11 U.S.C. § 554.

bidding, to a level that yielded a return to him.[29]

Belisle has not argued that a bankruptcy proceeding could have yielded any benefits to an estate through other avenues, such as avoiding unperfected liens,[30] recovering preferential payments[31] or unwinding fraudulent transfers.[32] Indeed, given the structure of the transaction by which Belisle sold his stock to Smith's corporation, a bankruptcy trustee might well have attempted to defeat Belisle's claims and to recover the payments Belisle received from KP.[33]

Although Belisle was upset that Smith was selling inventory at or near cost in the spring of 1991 and perceived other irregularities in KP's operations, he knew, too, that KP was liquidating its assets at Fleet's insistence.[34] His investigation of alleged improprieties was, for the most part, conducted after, not before, he filed the bankruptcy petition. Even if Belisle's concerns were well founded, he offers no justification for waiting until the eve of Fleet's foreclosure to file the petition. *Cf. In re Little Creek Development Co.*, 779 F.2d 1068, 1073–74 (5th Cir.1986) (commenting that voluntary filing on eve of foreclosure without reorganization prospects can be an indication of bad faith).

After KP filed its answer, which included a list of more than twelve creditors, Belisle made no attempt to obtain additional petitioners as he was entitled to do under § 303(c). *See* F.R.Bankr.P. 1003(b). *Cf. In re International Mobile Advertising*, 117

B.R. at 159 (applying Rule 9011, attorney's willingness to dismiss case brought by single petitioner when debtor demonstrated it had more than twelve creditors viewed as evidence of good faith). Moreover, even after Fleet obtained relief from stay and proceeded with its auction and, therefore, even after Belisle's stated objectives were beyond reach, he did not seek to end the proceeding but, rather, pushed it to final adjudication.

■ Thus, I find that Belisle filed the petition against KP in bad faith. His actions were not objectively reasonable; he conducted insufficient inquiry into material facts; he invoked bankruptcy procedures in circumstances where their application was not appropriate; and he was largely motivated by an improper purpose: delay of the Fleet foreclosure.

Finally, I find no basis to consider an advice of counsel defense on the record before me. Although some courts hold that such a defense may defeat § 303(i) claims in certain circumstances, *In re Walden*, 787 F.2d at 174 (unjust to award fees and costs against petitioner because its counsel chose the wrong legal avenue); *In re Better Care, Ltd.*, 97 B.R. at 412 (advice of counsel defense may defeat bad faith finding in the absence of malice); *In re Advance Press & Litho*, 46 B.R. at 704 (recognizing defense); and although the defense was briefly urged by Belisle's counsel in closing, the record is without meaningful evidence that Belisle relied on coun-

---

29. Fleet foreclosed its real estate mortgage under Maine's corporate power of sale statute. 14 M.R.S.A. § 6203–A. Proceeds in excess of Fleet's claim, costs of sale and senior encumbrances would be paid to Belisle. *Id.* As to any personal property, Belisle could protect his rights under Maine's version of UCC Article 9. *See* 11 M.R.S.A. § 9–504(3).

30. 11 U.S.C. § 544.

31. 11 U.S.C. § 547(b).

32. 11 U.S.C. § 548.

33. Although Belisle claimed he was owed money under a deferred compensation agreement and a consulting agreement, he acknowledged

that he did little if anything for KP after closing. Among other things, a Chapter 7 trustee would have scrutinized Belisle's claimed status as a secured creditor and the bases on which KP was obligated to him for what was, in essence, a part of its own purchase price. *See, e.g.*, 11 U.S.C. §§ 544, 547, 548. Belisle exchanged a substantial portion of his equity in KP for debt. *Cf. Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 645–46 (3rd Cir.1991) (discussing § 548's application in leveraged buyout context).

34. Belisle discussed KP's inventory sales with representatives of Fleet. When he expressed concerns about the manner in which the liquidation was proceeding, the bank made inquiries and concluded that nothing was amiss.

sel's advice to such an extent that his conduct should be excused.

#### c. Compensatory Damages.

■ Having found bad faith, the question remains what elements of damage, if any, should be awarded. I conclude that, although this is not a case in which a going concern has been wounded by improperly initiated involuntary bankruptcy proceedings, KP has suffered certain quantifiable damage, flowing directly from the delay occasioned by the filing, for which it should be compensated. *Cf. In re SBA Factors of Miami*, 13 B.R. at 100 (cataloging damage done to going concern by wrongful involuntary filing).

Damages directly attributable to the bad faith filing include: [35]

| | | |
|---|---|---:|
| 1. | Prorated real estate taxes | $ 201.96 |
| 2. | Insurance (hazard and liability) [36] | 1,172.63 |
| 3. | Costs of aborted auction[37] | 9,424.78 |
| 4. | Repairs and maintenance at KP facility, pending second auction | 403.75 |
| 5. | Interest accrual (on portion of principal retired by the auction sale) | 6,650.00 |
| 6. | Bank legal fees and expenses, including fees for bankruptcy-related services (added to loan balance) | 3,835.00 |
| 7. | Utilities (telephone and electricity) [38] | 1,002.18 |
| 8. | Yard security before auction (1 night) | 120.00 |
| | Total | $22,810.30 |

#### d. Punitive Damages.

KP asks that punitive damages be assessed against Belisle. Section 303(i)(2) clearly provides for a discretionary punitive damages award, but imposition of punitive damages does not necessarily follow a bad faith finding.

The purposes for assessing punitive damages are to punish the wrongdoer, to deter him from repeating his misdeeds, and to set an example so that others will be dissuaded from engaging in such conduct. *In re Fox Island Square Partnership*, 106 B.R. at 962; *In re Advance Press & Litho*, 46 B.R. at 706; *In re Grecian Heights Owners' Ass'n*, 27 B.R. at 174. Under § 303(i), the inquiry invokes a federal standard, requiring the court to exercise its discretion in a manner that will discourage misuse of the bankruptcy process, without discouraging resort to it in appropriate circumstances. *See In re Advance Press &*

---

**35.** Prorations in the damages calculations are based upon the period between the original auction date (June 26, 1991) and the actual auction date (September 12, 1991).

**36.** The insurance expense is based on one payment made under a premium financing agreement during the relevant period. KP Exhibit 9B. Because the per diem cost of coverage would yield a much higher figure, KP Exhibits 9A & 9B, the amount paid is the proper amount upon which to base a damage award.

**37.** Auction expenses include advertising, legal notice publication, process service and auctioneer's fees for the cancelled sale, plus portable toilet rental for June 26. KP is liable to Fleet for those expenses under the terms of its loan. The summary of those expenses, KP Exhibit 12B, includes $5,186.22 in "legal fees" that are unexplained. That component of the claim is disallowed.

**38.** Electric bills in evidence, KP Exhibit 5, disclose $541.91 in charges for power consumption in July, August and September. Accompanying payment records disclose only $474.54 paid by KP during the same period. Damages are awarded in the amount paid. Telephone bills disclose regular phone service expense of $320.19, $158.52 and $194.74 on New England Telephone bills dated July 18, August 18 and September 18, 1991, respectively (finance charges on unpaid arrearages have been subtracted). During the same period, the bills disclose payments totalling $527.64. KP Exhibit 4A. Again, damages will be awarded in the amount paid only. U.S. Sprint charges of $13.91 were billed in July, but there is no evidence of payment. During the same period, mobile phone bills total $318.43 were issued by UNICEL, but were for an account in the individual name of George E. Smith. Thus, they are not elements of damage for KP.

*Litho,* 46 B.R. at 706.[39] If punitive damages are called for, the award must be carefully tailored in light of other damages and fees awarded in the case, so that the result implements bankruptcy policy, but is not "unduly harsh." *In re Fox Island Square Partnership,* 106 B.R. at 968.

Belisle's conduct, although misguided and recalcitrant, was not malicious or vengeful. Taking into account the substantial award of fees, costs and compensatory damages that will issue and being aware of the resolution of setoff issues,[40] I do not consider that the policy at work in § 303(i) would be advanced by awarding punitive damages here. Neither do I think that failure to award punitive damages will impair that policy. Belisle will not repeat his rash resort to the bankruptcy laws in the future. Today's decision will discourage potential involuntary bankruptcy petitioners from undertaking similar actions, while assuring them that this court's door remains open for those whose rights are in legitimate need of protection. Thus, KP's request for a punitive damages award will be denied.

### 4. *Counterclaim.*

■ Included in KP's responses to the involuntary petition was its claim that, because Belisle's failure to pay KP's workers' compensation insurance premium arrearages pursuant to the indemnity agreement was part of his ongoing, ill-willed campaign against KP, judgment should enter against him in the amount of those arrearages. The brief answer to that contention is contained in F.R.Bankr.P. 1011(d).[41]

The debtor in an involuntary case may not bring forward all claims it has against petitioning creditors, other than to establish that an order for relief should not be entered because, say, a petitioner's claim is disputed.[42] Following dismissal the court may retain jurisdiction to award fees, costs and damages attributable to an unsuccessful filing.[43]

Whatever claims KP has, or may have, against Belisle on account of the indemnity agreement are not within the scope of damages "proximately caused" the involuntary filing. 11 U.S.C. § 303(i)(2). Those claims must be adjudicated, if at all, elsewhere.

### 5. *Setoff.*

KP asserts that damages awarded it under § 303(i) are not subject to setoff by Belisle. Belisle, who estimates his claim against KP as in excess of $800,000.00, disagrees. As a practical matter, should Belisle exercise setoff, his worthless claim[44] against KP would be reduced and KP would have no recovery.

The doctrine of setoff has deep roots in equity,[45] and has long been a concern of bankruptcy laws.[46] In general practice,

---

**39.** Some courts have viewed the content of the federal standard in light of general state law principles. *See In re Salmon,* 128 B.R. at 318; *In re Tarasi & Tighe,* 88 B.R. 706, 713 (Bankr. W.D.Pa.1988).

**40.** *See* discussion *infra,* text at n. 44.

**41.** F.R.Bankr.P. 1011(d) provides:
Claims Against Petitioners. A claim against a petitioning creditor may not be asserted in the answer except for the purpose of defeating the petition.

**42.** *See In re Walden,* 781 F.2d 1121, 1123 (5th Cir.1986) (F.R.Bankr.P. 1011(d) prohibits the assertion of a claim against a petitioning creditor in the debtor's answer unless the claim defeats the petition). *Cf. In re Onyx Telecommunications, Ltd.,* 60 B.R. 492, 498 (Bankr.S.D.N.Y. 1985) (where the assertion of counterclaims does not controvert the claim upon which the petition rests but merely serves to offset the amount owing if the counterclaim is proven, the counterclaim's existence fails to establish that the claim is subject to a *bona fide* dispute).

**43.** *See In re Sweet Transfer & Storage, Inc.,* 896 F.2d 1189, 1191 (9th Cir.1990); *In re Cooper School of Art, Inc.,* 709 F.2d 1104, 1105 (6th Cir.1983); *In re Advance Press & Litho, Inc.,* 46 B.R. 700 (Bankr.D.Colo.1984).

**44.** Belisle's claim remains subordinated to Fleet's. KP's assets have been sold, Fleet remains unpaid and the company is defunct.

**45.** *See generally* Loyd, *The Development of Set–Off,* 64 U.Pa.L.Rev. 541, 546, (1916) [hereinafter Loyd, *The Development of Set–Off*].

**46.** Loyd, *The Development of Set–Off, supra* n. 45, at 547. *See also* Sepinuck, *The Problems With Setoff: A Proposed Legislative Solution,* 30 Wm. & Mary L.Rev. 51 (1988) [hereinafter Sepi-

setoff enables one of two parties with mutual debts to reduce amounts due the other by amounts due him. Setoff gains significance as a remedy when one of the parties to mutual debts becomes insolvent or a debtor in bankruptcy. In such instances, it may become the only effective avenue of collection available to the solvent creditor.[47] The Bankruptcy Code subjects the right of setoff to the automatic stay,[48] recognizes that setoff rights are tantamount to security for a claim[49] and, with qualifications, leaves them unaffected.[50]

In contrast to situations when setoff, and bankruptcy restrictions on its exercise, operate after an order for relief is entered, this case presents circumstances in which the bankruptcy case has been dismissed. Thus, the automatic stay and that part of § 553(a)'s codified mutuality requirement providing that the right to setoff is restricted to mutual *pre-petition* debts do not pertain. Setoff, were it to occur at all, would necessarily be invoked after dismissal, where neither § 362 nor § 553 holds sway.

The issue of setoff against § 303(i) awards has been addressed in few instances. In *In re Schiliro*, 72 B.R. 147 (Bankr. E.D.Pa.1987), the court refused to permit an unsuccessful petitioner to setoff its claims against an award of attorney's fees and costs entered pursuant to § 303(i)(1). Among the reasons supporting its holding, the court cited congressional policy to discourage meritless involuntary bankruptcy petitions and lack of mutuality. *Id.* at 149–51. *In re Better Care, Ltd.* rejected *Schiliro's* reasoning and declared that a petitioning creditor's claims could be setoff against a § 303(i) award.[51]

Section 303(i) is clear that an award of fees, costs or damages is to enter in favor of the debtor who has successfully defended the involuntary petition.[52] Thus, I find unconvincing the *Schiliro* court's view that a fees award is not a mutual debt subject to setoff because it inures to the benefit of debtor's counsel.[53] However, *Better Care's* dismissal of the important bankruptcy policies that would be blunted by allowing setoff is unsatisfying. As the *Schiliro* court observed:

> We believe that there are very strong public policy reasons why an award pursuant to § 303(i) should not and cannot be permitted to be set off against the unsuccessful petitioning creditor's claims against the Debtor. It can be assumed that most, if not all, petitioning creditors in involuntary cases are owed sums by Debtors. If the petitioning creditor could suffer no other recourse except a reduction in his probably-uncollectible judgment as a penalty for requiring a debtor to defend an unjustified case, and Congress has specifically stated should result in such a penalty, the disincentive built into the system to discourage such actions would evaporate. The rule sought ... would surely be a boon to creditors who seek to wear down to submission small debtors such as the Debtor here.

*In re Schiliro*, 72 B.R. at 149. *Cf. In re Salmon*, 128 B.R. at 315 (holding prior § 303(i) award non-dischargeable in petitioner's subsequent bankruptcy).

Belisle may not exercise setoff against KP's § 303(i) award for two reasons. First, setoff may not be invoked because at least one essential prerequisite

---

nuck, *The Problems With Setoff*]; Morton, *Creditor Set-Offs in Business Reorganizations and Relief Cases Under the Bankruptcy Act,* 50 Am. Bankr.L.J. 373 (1976).

**47.** Sepinuck, *The Problems With Setoff, supra* n. 46, at 58.

**48.** 11 U.S.C. § 362(a)(7).

**49.** 11 U.S.C. § 506(a).

**50.** *See* 11 U.S.C. § 553.

**51.** *Better Care* did not, however, permit setoff to be exercised. The court reserved jurisdiction to review the merits of the petitioning creditor's claim in order to pass upon "the propriety" of set-off in light of the claim's character. 97 B.R. at 415.

**52.** Section 303(i) provides that judgment may enter if, *inter alia, "the debtor* does not waive the right to judgment...." (Emphasis supplied.)

**53.** *In re Schiliro,* 72 B.R. at 150–51.

is lacking. In order for setoff to operate, the debts must be mutual. Mutuality includes the requirement that debts "must be between the same parties and must be owing to and due in the same capacities."[54] Belisle's claims are not presently "owing and due" because Fleet, to whom Belisle is subordinated, remains unsatisfied. Thus, mutuality is lacking.

More importantly, however, this court has the power under § 105(a) to frame its orders as necessary or appropriate to carry out the provisions of the Bankruptcy Code.[55] Because the purpose and effective operation of § 303(i) would be impaired if Belisle were permitted to setoff his claims against KP's § 303(i) damage award, I will include in KP's judgment a provision expressly precluding Belisle's exercise of setoff rights.

### Conclusion

For the reasons set forth above, KP is awarded:

1. Costs per § 303(i)(1)                                        $ 1,392.85[56]
2. Attorney's fees per § 303(i)(1) in an amount to be determined; and
3. Compensatory damages                                   $22,810.30

A separate judgment shall enter forthwith.

---

**54.** Sepinuck, *The Problems With Setoff, supra* n. 46, at 68. *See also* Loyd, *The Development of Set–Off, supra,* n. 45, at 553.

**55.** 11 U.S.C. § 105(a) provides:
   The court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.
   Although § 105(a) should not be viewed as a panacea for all ills confronted in a bankruptcy case, it is clearly meant to enable the court to see that other provisions of the Code are implemented. *See* 2 Collier on Bankruptcy, Par. 105.-01[3] (15th Ed.1991).

**56.** To this sum may be added additional expenses included in a fee application, if and when submitted, *supra* n. 12.