In the Matter of Edwin B. SALMON, Jr., Debtor.

Dana C. SJOSTEDT, Plaintiff,

v.

Edwin B. SALMON, Jr., Defendant.

Bankruptcy No. 88–3829–8B7.

Adv. No. 88–448.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

June 12, 1991.

Michael J. Keane, for plaintiff.

R. Michael DeLoach, for defendant, debtor.

---

FINDINGS OF FACT, CONCLUSIONS
OF LAW AND MEMORANDUM
OPINION

THOMAS E. BAYNES, Jr., Bankruptcy Judge.

THIS CAUSE came on to be heard upon Debtor's, Edwin B. Salmon, Jr.'s, objection to the claim of Dana C. Sjostedt and upon the complaint of Dana C. Sjostedt to determine the dischargeability of the claimed debt pursuant to Title 11 U.S.C. § 523(a)(6).

Sjostedt's claim arises from the filing of an involuntary bankruptcy proceeding by Salmon against Sjostedt. In 1983, Salmon was one of three initial petitioning creditors in the involuntary bankruptcy proceeding styled *In re Dana C. Sjostedt,* No. 83–2217–8P7, filed in the United States Bankruptcy Court for the Middle District of Florida, Tampa Division.

On January 9, 1986, after a final evidentiary hearing, the Hon. Alexander L. Paskay, Chief Bankruptcy Judge, dismissed the involuntary petition and found Salmon had filed the involuntary proceeding against Sjostedt in bad faith pursuant to Section 303(i) of the Bankruptcy Code. The Bankruptcy Court retained jurisdiction for the limited purpose of considering any sanctions which may be imposed against Salmon pursuant to Title 11 U.S.C. § 303(i)(1) and (2). Sjostedt's motion to impose sanctions was scheduled to be heard by this Court on July 8, 1988. On July 7, 1988, Salmon filed a voluntary Chapter 7 petition in this Court, No. 88–3829–8B7, which stayed the sanctions hearing in the Sjostedt case.

Sjostedt thereafter timely filed a proof of claim in the Salmon Chapter 7 case in the amount of $8,554,248 [1] predicated on sanctions which could be awarded under Section 303 of the Bankruptcy Code. Salmon timely filed an objection to the Sjostedt claim. Sjostedt, then, filed an adversary proceeding under Section 523(a)(6) seeking to determine the nondischargeability of his claim for sanctions against Salmon. Sjostedt alleges in his complaint that the amount of damages he is entitled to pursuant to Title 11 U.S.C. § 303(i)(1) and (2) is nondischargeable because Salmon's filing the involuntary petition in bad faith constituted a willful and malicious injury to Sjostedt contemplated under Section 523(a)(6).

This Court heard testimony, received into evidence both the record and deposition transcripts, other documentary evidence, heard argument of counsel, and considered legal precedent submitted by both parties plus proposed findings of fact and conclu-

---

**1.** The claim includes compensatory damages in the amount of $8,272,248, punitive damages in the amount of $250,000, and attorneys fees and costs in the amount of $32,000.

sions of law. All evidence was submitted both to liquidate Sjostedt's claim and Salmon's objection, and ultimately to determine whether or not any claim of Sjostedt against Salmon is nondischargeable.

## DISCUSSION

■ The initial inquiry involves the juxtaposition of Sections 303 and 523(a)(6). Is a determination of bad faith pursuant to Section 303 equivalent to a willful and malicious injury by debtor to another entity or to property of another entity under Section 523(a)(6)?

Judge Paskay, in determining Salmon's bad faith in filing the involuntary petition against Sjostedt, characterized the entire affair as

Most telling and important, however, that [it] is quite clear that this was clearly basically an underlying, two-party dispute. And the evidence in this record is replete with uncontradicted evidence, the animosity between the parties and the desire and motivation of Mr. Salmon to ruin and destroy and put in jail and put out of business this particular Debtor [Sjostedt].

Now, based on the foregoing, this Court is satisfied that the petition was definitely and clearly filed in bad faith. And therefore, just for no other reason, this Court is satisfied that the petition of Mr. Salmon should be dismissed with prejudice.

Sjostedt's assertion that sanctions under Section 303 as a result of Salmon's bad faith should be characterized as willful and malicious under Section 523(a)(6), is supported by Congressional intent. Congress clearly created a remedy for malicious prosecution in the form of a bad faith filing of an involuntary petition in bankruptcy. *See In re Better Care, Ltd.*, 97 B.R. 405, 409–413 (Bankr.N.D.Ill.1989), for a thorough discussion of the varying approaches in defining bad faith under Section 303(i).

After reviewing the transcript of the hearing on the determination of Salmon's bad faith before Judge Paskay, this Court finds the facts elicited in Sjostedt's involuntary case were sufficient not only to establish the bad faith of Salmon in filing the involuntary petition, but also to establish his acts were equivalent to a willful and malicious injury to Sjostedt. *Lee v. Ikner (In re Ikner)*, 883 F.2d 986 (11th Cir.1989).

■ Having determined which acts are the basis for the bad faith filing of the involuntary Chapter 7 petition and which are equivalent to the willful and malicious injury pursuant to Section 523(a)(6), the next issue relates to the standard of proof which must be established in order to determine the debt nondischargeable under Section 523(a)(6). Notwithstanding the recent Supreme Court decision establishing the standard of proof in dischargeability cases as preponderance of the evidence, *see Grogan v. Garner*, —— U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), this Court is bound by the Court of Appeals for the Eleventh Circuit's prior determination that the standard of proof in such cases is clear and convincing. *Ikner*, 883 F.2d at 989. At this juncture, one could argue this Court is bound by Judge Paskay's determination of bad faith in the involuntary case either on the doctrine of res judicata or collateral estoppel.[2] Notwithstanding the applicability of either doctrine, the evidence established against Salmon in the involuntary case meets the standard of clear and convincing evidence.

Even if such evidence only met the preponderance standard, this Court would be reluctant to determine bad faith sanctions pursuant to Section 303 of the Bankruptcy Code were dischargeable in another bankruptcy case. Such a determination would, in effect, destroy bankruptcy policy of requiring all creditors to file involuntary bankruptcy petitions in good faith. Such would endorse, as in this case, vindictiveness, spite, vengeance, and a sanctuary for the abuse of fundamental concepts associ-

---

2. Under both doctrines this Court's determination of either claim or issue preclusion would be dependent upon the same standard of proof issue. This Court does not consider *Grogan v.*

*Garner*, 111 S.Ct. 654, to be retroactive, at least not to the facts in this case. *Chang v. Daniels (In re Daniels)*, 91 B.R. 981 (Bankr.M.D.Fla. 1988).

ated with both the prior Bankruptcy Act and the Bankruptcy Code.

■ Similarly, punitive damages under the facts of this case are nondischargeable notwithstanding the number of courts which previously held punitive damages are dischargeable under Section 523(a)(6).[3] Here, we are dealing with the efficacy of the bankruptcy system. A bad faith filing goes not only to Salmon's filing of the involuntary petition, but also goes to the utilization of the entire bankruptcy system. It is distinguishable from a basic case where two parties are affected. Here, the unique involuntary bankruptcy machine is put in action which causes significant burdens and stigmata without the benefit of reorganization or discharge. Sjostedt was under the shadow of his Chapter 7 case for three years before the case was dismissed. During that time, his financial activities were affected. All of Sjostedt's claims in this action were a direct and proximate result of Salmon's bad faith filing.

## COMPENSATORY DAMAGES

■ If a petitioning creditor files an involuntary petition in bad faith, the Court may award the debtor any damages proximately caused by the filing of the petition. Title 11 U.S.C. § 303(i)(2)(A). "Damages may include such items as loss of business during and after the pendency of the case, and so on." H.R.Rep. No. 595, 95th Cong., 1st Sess. 324 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6280; S.Rep. No. 989, 95th Cong., 2d Sess. 34 (1978), U.S. Code Cong. & Admin.News 1978, pp. 5787, 5820. The Court may also award costs, (Section 303(i)(1)(A)), reasonable attorney's fees (Section 303(i)(1)(B)) and punitive damages (Section 303(i)(2)(B)). In a malicious prosecution case, the general rule is the plaintiff may recover all damages that are the natural and probable consequence of the action complained of. The damages must be certain and proximate, and not uncertain, contingent or speculative. 52 Am.Jur.2d *Malicious Prosecution* § 96 (1970); *see also S.H. Kress & Co. v. Powell,* 132 Fla. 471, 180 So. 757 (1938). The plaintiff may recover for any financial loss resulting to him directly from the prosecution and may recover for injuries suffered in respect of his business. 52 Am.Jur.2d *Malicious Prosecution* §§ 97, 101 (1970).

■ Sjostedt, in his proof of claim, originally sought compensatory damages of $8,272,248 relating to the losses of income and other compensation from two real estate projects: the Long Bayou project and the Floridan Hotel project. Subsequently, Sjostedt lowered the compensatory claim to $1,999,478. These compensatory damages were allegedly caused by the filing of the involuntary petition by Salmon.

Initially, Sjostedt and Salmon, along with others, were partners in various real estate developments during the early 1980's. Financially, their method of development involved expansion through debt-for-equity transactions. There is no doubt both Sjostedt and Salmon have acquired extensive development skills and experience. Sjostedt and Salmon dissolved their partnership, and by 1983, when the involuntary petition was filed, Sjostedt was operating his own projects.

The pre-petition Long Bayou project was to be an 860–unit condominium development of which Sjostedt was a general partner. At the time of the filing of the involuntary petition there were 50 units built and there were 50 other units that would be built from the proceeds of a loan from Mid–Atlantic Mortgage. Sjostedt, as the general partner, was to receive $7,000 per month for two years. There was some question whether the duration was one year with an option, but the evidence estab-

---

**3.** *Gnidovec v. Alwan (In re Alwan Bros.),* 105 B.R. 886 (Bankr.C.D.Ill.1989) (Punitive damages are dischargeable in bankruptcy), *citing Couch v. Rubitschung (In re Rubitschung),* 101 B.R. 28 (Bankr.C.D.Ill.1988). *Contra Moraes v. Adams (In re Adams),* 761 F.2d 1422, 1428 (9th Cir. 1985) (Punitive damages are subject to findings of nondischargeability resulting from willful or malicious injury pursuant to Sections 523(a)(6) and 523(a)(9) of the Bankruptcy Code.). *See generally* Ryan, *Punitive Damages: Dischargeable or not in Bankruptcy,* 18 Cal.Bankr.J. 291 (1990).

lishes that two years was definitely a possible duration for his general partnership activities. Mid–Atlantic Mortgage was necessary to the Long Bayou project in order for the Long Bayou project to meet its cash requirements. The loan proceeds would allow necessary capital to build an additional 50 units to be marketed. These funds would be sufficient to carry the project over the next two years. In February 1984, Mid–Atlantic Mortgage terminated its commitment letter. Deposition testimony and communications from Mid–Atlantic Mortgage officials clearly show the commitment from Mid–Atlantic Mortgage was terminated because of the involuntary petition in bankruptcy of Sjostedt.

The Floridan Hotel project is a post-petition activity of Sjostedt in conjunction with others. A Massachusetts Limited Partnership was created for the sole purpose of raising investment funds for the creation of the Floridan Hotel project, actually a renovation of an existing hotel in Tampa, Florida. The operating ownership was to be a Florida limited partnership which would manage the project and Sjostedt would be its general partner.

The Floridan Hotel would be purchased for $4,000,000 from its owner. The financing would be accomplished through the investors of the Massachusetts Limited Partnership and City Federal loan commitment. Evidence shows the Massachusetts Limited Partnership had funds or investor notes sufficient enough to begin the project. There was a loan commitment through City Federal that had all conditions met except resolution of the involuntary bankruptcy of Sjostedt. An oral agreement had been reached with the owner of the Floridan Hotel. The loan commitment of City Federal was later withdrawn.

Among the various agreements which were to be executed as a part of the Floridan Hotel project were numerous mechanisms which would compensate Sjostedt as general partner of the Floridan Hotel operating partnership including: 1) a possible commission on the sale of the property to the partnership, although documents suggested a commission would only be allowed to unrelated parties; 2) a management fee agreement of $200,000 with $50,000 the first year, $25,000 the next three years, and $75,000 lump sum paid in 1989, all predicated on closing of the deal; 3) a development service fee to the general partner for supervising the project of $600,000 with $50,000 paid the first year, the remainder deferred over a period of time with a percentage interest until paid at sale or refinancing; 4) an operating deficit guarantee fee which would be received if the project closed and its construction was completed by December 31, 1987; and 5) a cost over-run fee of $75,000 if the job was brought in under $8,800,000. This was in conjunction with a construction interest savings fee of $600,000 where the project costs were less than $9,500,000.

Sjostedt testified he had discussions with various general contractors, who were willing to execute contracts to complete the project at costs not to exceed these numbers. There was a developer's fee for tenant improvements if they were less than $2,900,000. Further, upon the sale of the project, the general partner was to receive 38% of the project after $6,700,000 was paid out to the limited partnership. There were some additional funds related to the overall sale of the completed project. Projections by Touche Ross accountants suggested a conservative number for a sale of the completed project would be approximately $12,000,000 establishing somewhere in the neighborhood of $4,700,000 to Sjostedt as his percentage profit from the sale.

In opposition, Salmon points out, one of the major impediments associated with the Long Bayou project is that Sjostedt's associate in the project testified the demise of the project was predicated on the insolvency (not bankruptcy) of Sjostedt and the Mid–Atlantic loan was not the only viable financing for the project. According to Salmon, this leads one to the conclusion the Long Bayou project was a speculative venture under any terms and the completion date could not be readily predicted.

As to the Floridan Hotel project, Salmon notes numerous major deficiencies which make the project more speculative than the

Long Bayou project. First, no written commitment existed for the sale of the Floridan Hotel from the owner to the limited partnership. Second, there is a monstrous problem of asbestos removal or containment in the building. Third, the fees Sjostedt would receive from the project were predicated on meeting certain time frames which were all speculative and if Sjostedt did not meet those time frames, he would become personally liable for most of the costs of the project beyond the fees he might obtain.

As to the damages associated with the Long Bayou project, the Court is convinced the evidence is not so speculative as to deny Sjostedt his damages. Clearly, at the time of the filing of the petition, Mid–Atlantic Mortgage was committed to loaning money to the project. The withdrawal of the commitment, as established by the lender's documents and other evidence, was predicated upon the involuntary petition filed against Sjostedt. While there may be other dynamics to the survival of the Long Bayou project, the loss of the Mid–Atlantic mortgage commitment was its death blow. The evidence is uncontroverted that if the loan was funded, the project would continue at least for 24 months. Therefore, Sjostedt is entitled to damages equal to the amount he would have received as a partner during that time. The Court awards damages of $168,000 plus pre-judgment interest of 12% from the date of filing of the petition based on a $7,000 per month partnership fee for a 24–month period.

The Floridan Hotel project is unique. It is not easy for this Court to ignore the essence of the project much less the vast amount of evidence related to the project in light of this Court's familiarity with the project from another bankruptcy case. Sjostedt's prescience for the building surely could not be acknowledged if the test for damages was the status of the hotel in today's milieu. Clearly, the observation of the evidence and the analysis of the damages must be predicated on a review during a time frame from the filing date of the involuntary petition until dismissal of the involuntary case. The Court finds the Floridan Hotel project had sufficient funding

and had proceeded to a specific level of development that a closing on the property purchase could have taken place and Sjostedt would have been entitled to the initial payments of the operating general partner of the project. The Court would award damages of the following:

A. A management fee of $50,000.

B. A development service fee of $50,-000.

The Court finds Sjostedt is not entitled to a commission relating to the sale of the project to the partnership because no written contract existed for the sale and no specific contract existed between Sjostedt and the partnership with respect to the commission, notwithstanding testimony that Sjostedt could have created such documents at any time. Any other damages associated with compensation to Sjostedt are considered by this Court to be speculative. The agreement requires the project to be at certain stages or to have produced certain cost benefits which must be juxtaposed against the setoffs the partnership may have against the general partner's guarantees. Therefore, the Court limits the damages to Sjostedt from the Floridan Hotel project to $100,000 plus pre-judgment interest at 12% from the date of filing of the involuntary petition until the dismissal of the involuntary case.

## PUNITIVE DAMAGES

As stated before, if the Court finds a creditor filed an involuntary petition in bad faith, the Court may grant judgment against the creditor for punitive damages. Title 11 U.S.C. § 303(i)(2)(B). These punitive damages are determined to be nondischargeable pursuant to Title 11 U.S.C. § 523(a)(6).

The general rule in ascertaining the amount of punitive damages is they must bear some reasonable relation to the injury inflicted and its cause. Punitive damages should be sufficient to deter the wrongdoer. 22 Am.Jur.2d *Damages* § 805 (1988). The factors the Court may consider when assessing punitive damages include:

the nature, extent, and enormity of the wrong, the intent of the party committing it and all circumstances attending the particular incident, as well as any mitigating circumstances which may operate to reduce without wholly defeating such damages, including financial position of defendant but that the evidence of financial position may not be considered in passing upon the question of law as to whether the case is one in which punitive damages may be allowed. *Rinaldi v. Aaron*, 314 So.2d 762 (Fla.1975). 22 Am.Jur.2d *Damages* § 807 (1988). *See also* Restatement, Torts 2d § 908(2). The Court would also note that punitive damages do not violate the due process clause of the 14th amendment. *Pacific Mutual Life Ins. Co. v. Haslip*, — U.S. —, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991).

After reviewing the facts of this particular case the Court awards punitive damages in the amount of $250,000 plus interest of 12% as provided herein.

Accordingly, it is

ORDERED, ADJUDGED AND DE-CREED that Objection to the claim of Dana C. Sjostedt is sustained in part and the Court will allow the claim in the amount of $518,000 plus interest of 12% as provided herein. It is further

ORDERED, ADJUDGED AND DE-CREED that the debt in the amount of $268,000 plus interest of 12% as provided herein is determined to be nondischargeable pursuant to Title 11 U.S.C. § 523(a)(6). It is further

ORDERED, ADJUDGED AND DE-CREED that punitive damages in the amount of $250,000 plus interest of 12% as provided herein is determined to be nondischargeable. A final judgment will be entered pursuant to Bankruptcy Rule 9021. It is further

ORDERED, ADJUDGED AND DE-CREED that the Court reserves jurisdiction to determine attorneys' fees and costs of the Plaintiff.

DONE AND ORDERED.