**In re OAKLEY CUSTOM HOMES, INC., EIN # Not Provided, a Colorado corporation, Alleged Debtor.**

**Bankruptcy No. 93–21353–SBB.**

United States Bankruptcy Court, D. Colorado.

March 31, 1994.

Keith Moskowitz, Boulder, CO, for Catherine Chandler and Robert Kelley.

Steven E. Harris, Osgood, Simpson and Harris, L.L.C., Boulder, CO, for alleged debtor.

SIDNEY B. BROOKS, Bankruptcy Judge.

## MEMORANDUM OPINION AND ORDER

SIDNEY B. BROOKS, Bankruptcy Judge.

THIS MATTER came before the Court on the Involuntary Petition in bankruptcy filed by two creditors of Oakley Custom Homes, Inc. ("Alleged Debtor"). The Court, after preliminary hearing held December 9, 1993 regarding the Alleged Debtor's Motion to Dismiss, held a trial on the Involuntary Petition, February 15 and 16, 1994. At the hearing, after presentation of the Petitioning Creditors' case, the Court dismissed the Involuntary Petition. The hearing continued on the remaining issues presented by the pleadings including the Alleged Debtor's allegations of the Petitioning Creditors' "bad faith filing" of the Involuntary Petition, and the Alleged Debtor's request for an award of attorney's fees, actual costs, and punitive damages. The Court took the matter under advisement. This Memorandum Opinion sets forth the Court's findings of fact, conclusions of law, and order.

## I. BACKGROUND

1. Initially, there were two Petitioning Creditors in this case, Robert A. Kelley and Catherine B. Chandler. They filed an Involuntary Petition against this Alleged Debtor on October 20, 1993.

2. The Alleged Debtor timely filed a response to the Involuntary Petition, disputing all claims raised. The Alleged Debtor moved for dismissal and an award of attorney's fees, actual damages, and punitive damages for the Petitioners' alleged bad faith filing of the Involuntary Petition.

3. This Court set a limited hearing on the issue of the Alleged Debtor's Motion to Dismiss, which hearing was held on December 9, 1993. One day before that scheduled hearing, on December 8, 1993, Mr. Kelley voluntarily withdrew as a Petitioning Creditor, admitting that his claim was subject to a *bona fide* dispute. Despite the withdrawal of Mr. Kelley as a Petitioning Creditor, this Court retained jurisdiction over such Petitioner regarding sanctions and damages, if any, as may be appropriate under 11 U.S.C. § 303(i).

4. At trial on this matter, February 15 and 16, 1994, the sole remaining Petitioning Creditor, Ms. Chandler, presented testimony and related evidence in support of the Petition.[1] The issues regarding attorney's fees, actual damages, and punitive damages were also heard.

## II. "SETTLEMENT AGREEMENT"/HARPIN CONNECTION

5. At the beginning of the trial, counsel for Petitioners, Keith Moskowitz, introduced, as a preliminary and "necessary" pretrial matter, a purported "settlement agreement," actually two written "agreements," each captioned "Global Settlement." Petitioners' counsel sought to introduce the documents to the Court and have the Court enforce the purported "settlement agreements," both versions of which were received by the Court and marked as Exhibits A1 and B1 ("Purported Settlement Agreement" herein).

6. The executed, but conditional, contingent, and incomplete Purported Settlement Agreement[2] was signed only by selected persons, in representative capacities: (a) Evan F. Perkins, as President of the Alleged Debtor, and (b) Vernon Jackson Harpin, as "President Empire Consulting & Funding, Inc., Alleged Consultant for Cathy [Chandler], Rob [Kelley], Creekside, [Evan] Perkins and whatever." The Purported Settlement Agreement was on Mr. Harpin's company's letterhead stationery.

7. The Purported Settlement Agreement attempted "global" settlement of this involuntary case and other pending state court litigation disputes among some of the same persons involved in this involuntary bankruptcy matter.

8. The Court found that the Purported Settlement Agreement was conditional and, in any event, not enforceable by its very terms. The putative Settlement Agreement, urged by Mr. Moskowitz, was, on its face, unenforceable, legally deficient, and defective; the Court refused to enforce same.

9. The Court found at the trial that, due to the introduction of the Purported Settlement Agreement by Mr. Moskowitz, and his advocacy of its various terms and provisions, the Petitioners opened the door for evidence of still other settlement negotiations offered by the Alleged Debtor, but which Petitioners had previously requested be stricken, as inadmissible.[3]

10. During trial, Ms. Chandler and Mr. Harpin both admitted that Mr. Harpin had acted as the agent of Petitioner, Ms. Chandler.

11. Mr. Harpin has, variously, held himself out and served as an agent and/or a financial consultant/business advisor to both of the original Petitioning Creditors, Mr.

---

1. Although Mr. Kelley withdrew as a Petitioner, both he and Mr. Harpin attended the full trial, and both testified at trial.

2. Terms of the Purported Settlement Agreement provided, *inter alia*, that it was contingent on the Alleged Debtor's attorney approving the agreement. That was never done.

3. The Court admitted substantial evidence of settlement negotiations, because (a) the Petitioning Creditors' attorney vigorously urged the Court to enforce the Purported Settlement Agreement(s), and thus "opened the door," and (b) the issue of whether the Petitioners filed the Involuntary Petition "in good faith" necessarily involved consideration of the parties' other litigation activities and the communications among the parties related to that litigation, related disputes, and the Involuntary Petition.

Kelley and Ms. Chandler, and to the Alleged Debtor, Creekside Partnership, and another, indirectly related, Chapter 11 debtor, Cimarron Ventures, Inc. Mr. Harpin has been an active and integral participant in events pertinent to the Alleged Debtor, the parties' disputes referenced herein, and the involuntary bankruptcy Petition.

12. Because of such agency, and the other significant roles played, acts initiated, and conduct undertaken by Mr. Harpin in this case, he has subjected himself to the jurisdiction of this Court.

13. Due to the admitted agency relationship between Ms. Chandler and Mr. Harpin, and the express authority granted by Ms. Chandler to Mr. Harpin, the actions of Mr. Harpin are attributable to and, in part, may properly be considered, actions of Petitioner, Ms. Chandler.

### III. *PRIOR AND RELATED LITIGATION*

14. In 1991, Mr. Perkins, who was to become a principal of the Debtor, became embroiled in a dispute with Jon Oakley over funds which Mr. Perkins invested in the Alleged Debtor. In the course of litigation with Mr. Oakley, Mr. Perkins and the Alleged Debtor obtained a judgment against Mr. Oakley for misappropriation of funds and obtained an order of the Boulder District Court in 92–CV–435, that the shares of Mr. Oakley be returned to the Alleged Debtor as partial satisfaction of the judgment obtained. Accordingly, Mr. Perkins was set to become the sole shareholder of the Alleged Debtor through retirement of Jon Oakley's stock certificates.

15. During this time, Mr. Perkins became acquainted with, and a business associate of, Petitioner, Mr. Kelley, in the Alleged Debtor and I.F.M. Investments, Inc. ("IFM" herein). An entity known as Creekside Partnership was established by IFM, a business partly or wholly owned by Mr. Kelley, and the Alleged Debtor. The Alleged Debtor and IFM, as partners, were to purchase and develop a piece of real property in Boulder known as Woodbridge.

16. In the course of the development of Woodbridge, Creekside Partnership became unable to meet the debt service and the property went into foreclosure. At that point, Mr. Kelley, and/or Mr. Perkins, acting through Creekside, hired Mr. Harpin to assist the partnership in salvaging the equity in Woodbridge.

17. On October 9, 1992, Woodbridge was sold; proceeds of about $70,000.00 were generated and paid in trust to Mr. Harpin, evidently through one or both of his companies, Cimarron Ventures, Inc. and Empire Consulting and Funding, Inc.

18. Mr. Harpin retained those funds and refused to pay them to Creekside Partnership. Litigation was commenced by Mr. Perkins in Boulder District Court, Civil Action No. 93–CV–429, to collect those monies.

19. Concurrently with the Creekside Partnership venture, the Alleged Debtor was developing another piece of real property known as Centennial Ranch Estates, in north Boulder County.

20. Centennial Ranch Estates was not an asset of Creekside Partnership.

21. Through the course of development of Centennial Ranch Estates, Mr. Kelley had advanced loan monies to that project.

22. Sometime after the issuance of the Boulder District Court order against Jon Oakley in Civil Action No. 92–CV–435, Mr. Kelley asserted an interest in the same stock, claiming an assignment of the stock by Mr. Oakley which predated the Boulder District Court's order in the summer of 1992.

23. Based on an affidavit of Mr. Harpin, the Kelley assignment was exposed as an artifice, an evident fraud. Mr. Kelley, thereafter, personally and on behalf of IFM, negotiated a settlement of claims against Centennial Ranch Estates, which Mr. Kelley may have had, in return for the assignment of a portion of the Alleged Debtor's judgment against Jon Oakley and for assignment to Mr. Kelley of a promissory note secured by other real property. This agreement is embodied in the Alleged Debtor's Exhibit A.

24. Through the course of recording several deeds by Mr. Harpin, in which Mr.

Kelley participated in the backdating of a deed in violation of the express terms of Exhibit A, the Alleged Debtor's record title in Centennial Ranch Estates was severely clouded. *See,* Alleged Debtor's Exhibits B and G.

25. On April 21, 1993, the Alleged Debtor quitclaimed Centennial Ranch Estates to Coastal Development Corporation ("Coastal"), and Coastal agreed to assume and pay the liability under the first deed of trust.

26. Based on the testimony of Mr. Perkins, the Court finds that the Alleged Debtor agreed to hold Coastal harmless from any and all costs, including legal expenses and lost profits due to the claims which might subsequently be made by Mr. Kelley or Mr. Harpin.

27. The Court has been provided with no evidence that the quitclaim transfer from the Alleged Debtor to Coastal was fraudulent, or otherwise improper.

28. Despite the transfer of Centennial Ranch Estates, the Alleged Debtor still maintains a claim in the Cimarron Ventures, Inc. bankruptcy of approximately $70,000.00, to which the Alleged Debtor claims entitlement of part or all as a general partner of Creekside Partnership.

29. After the quitclaim transfer of Centennial Ranch Estates, the Alleged Debtor and Coastal initiated a quiet title action and suit for damages against several persons including the two Petitioners and Mr. Harpin in Boulder District Court, Civil Action No. 93–CV–726.

30. Thereafter, the Boulder District Court ordered that the title be quieted in Coastal. That order was made final and is the subject of an appeal presently pending before the Colorado Court of Appeals.

31. Mr. Perkins testified as to conversations in which a Ken Krause, Mr. Kelley, and Mr. Harpin were participants.[4] That evidence shows that assistance from a David Warren McChesney had been solicited by Mr. Kelley and Mr. Harpin at a meeting in a restaurant, in May or early June of 1993. At that time, a plan was discussed to defeat and financially destroy Mr. Perkins and the Alleged Debtor through litigation. Mr. Harpin was identified as having said that he knew that the title issue created by the conveyance of Centennial Ranch Estates through a fraudulent deed would ultimately be won by Coastal and the Alleged Debtor, but that the litigation would financially break the Alleged Debtor and therefore prevent Centennial Ranch Estates from being developed.

32. There is also evidence that Mr. Kelley and Mr. Harpin also approached the holder of the first deed of trust to try and get it to foreclose on Coastal or, in the alternative, to allow Mr. Kelley and Mr. Harpin to buy the promissory note and take assignment of the deed of trust.

## IV.  *FLYNN–CIMARRON VENTURES' BANKRUPTCY*

33. Gary Flynn was called as a witness by the Alleged Debtor under subpoena. Mr. Flynn was the attorney for a corporate debtor, Cimarron Ventures, Inc. That debtor is presently involved in a Chapter 7 liquidation, after having been converted from a Chapter 11 proceeding in the United States Bankruptcy Court for the District of Colorado, Case No. 93–11053–CEM.

34. Petitioner, Mr. Kelley, objected in open Court to the testimony of Mr. Flynn as violative of the attorney-client privilege between Mr. Flynn and Cimarron Ventures, Inc.

35. The Court notes that the Alleged Debtor timely filed a Motion in Limine to have the issue of attorney-client privilege presented and decided prior to the hearing on February 15, 1994. The Court noted on the Alleged Debtor's Motion in Limine that if the Petitioners filed an objection to the motion to allow that testimony, then this Court would hear that issue in advance of February 15, 1994. There was no response, no opposition, filed by the Petitioners to the Alleged Debtor's Motion in Limine.

---

**4.** Although an objection could have been raised as to hearsay, no objection was made by Petitioners' counsel.

36. The Court also noted that the trustee and her attorneys, in the Cimarron Ventures, Inc. bankruptcy case, were given notice of this Alleged Debtor's intent to call Mr. Flynn and have him testify in this case. There was no response, no opposition to Mr. Flynn's testimony, filed by the trustee in the Cimarron Chapter 11 case.

37. Counsel for the Alleged Debtor made an offer of proof in open Court that the trustee in Cimarron Ventures, Inc. expressed that she had no objection to the testimony of Mr. Flynn in this proceeding. He also stated that the trustee in Cimarron Ventures, Inc. had indicated that while she (a) intended to retain the right and "proprietary interest" to which she succeeded as trustee, in the attorney-client privilege, and (b) did not waive same in the Cimarron case, still she was aware of Mr. Flynn being a witness in the within case and she had no intent to appear at these proceedings or object to Mr. Flynn's testimony.

38. The Court took judicial notice that Petitioner, Mr. Kelley, is evidently the sole shareholder in the Cimarron Ventures, Inc. bankruptcy and, as such, he had previously caused to be filed with the Bankruptcy Court Clerk, a great deal of "private" correspondence between Mr. Flynn and Cimarron Ventures, Inc., including correspondence between Mr. Flynn and Mr. Kelley.

39. Based on the foregoing and Mr. Kelley's lack of standing to object to Mr. Flynn's testimony, this Court found that (a) the attorney-client privilege could not be asserted by Mr. Kelley in this case, because it belongs to the trustee of the Cimarron Ventures, Inc. estate and, (b) in any event, the attorney-client privilege had been waived by repeated prior disclosures, mostly disclosures made by Mr. Kelley himself. Mr. Flynn was instructed to testify fully and accurately to all questions propounded, including those regarding communications which he had with principals of Cimarron Ventures, Inc.

40. Mr. Flynn recounted a series of conversations in which the principals of Cimarron Ventures, Inc., including Mr. Kelley, stated that they would financially ruin Mr. Perkins and his related business entities, with or without legal basis. Mr. Flynn stated that the purpose expressed by Mr. Kelley and Mr. Harpin was, in part, to out-litigate, to out-spend, Mr. Perkins; to prevail in the contested litigation by sheer force of financial resources.

41. Perhaps more significant is Mr. Flynn's testimony that Mr. Harpin threatened to get together with Mr. Kelley and hire a person to have Mr. Flynn killed. Whether or not Mr. Harpin and Mr. Kelley would go through with such a threat is not at issue; they clearly did not do so, in any event. What is at issue, however, is the alleged bad faith and conduct of the Petitioners.[5]

42. Mr. Flynn's testimony was credible. It corroborated portions of Mr. Perkins' testimony, which was also credible.

## V. CHANDLER CLAIM [6]

43. The sole remaining Petitioner at trial, Ms. Chandler, presented a copy of a promissory note which she contended was evidence that the Alleged Debtor signed a promissory note payable to her. Objection was raised by the Alleged Debtor as to admissibility and as to timeliness of production under this Court's previous procedural Order. This Court found that the exhibit was not timely produced and no persuasive explanation was given for its last minute, surprise, "discovery." The Court sustained the Alleged Debtor's objection.

44. The Court reviewed the following evidence regarding the issue raised by the Alleged Debtor, that the debt of Ms. Chandler

---

5. The testimony of Mr. Flynn was credible and persuasive. It is recited, in brief part, in Appendix A attached to this Order, to reflect, for the record, what the nature and extent of some of Mr. Kelley's and Mr. Harpin's conduct was vis-a-vis the Alleged Debtor and this involuntary bankruptcy case.

6. The Alleged Debtor claimed that it had more than 12 creditors, requiring that there be three qualified petitioning creditors. This Court found that there are only 11 such creditors with undisputed claims and, therefore, the Court found that there need be only one qualified petitioning creditor as required by 11 U.S.C. § 303(b).

was subject to a *bona fide* dispute and/or contingent, thereby disqualifying her under 11 U.S.C. § 303(b) as a petitioning creditor.

   a. The Court considered representations relative to the alleged promissory note [Petitioner's Exhibit A, the promissory note, dated December 19, 1990], which contained language of investment and references to projects in which Jon Oakley participated under a sole proprietorship called Oakley Construction.

   b. The Court considered Petitioner's Exhibit B, an Investment Agreement, dated December 19, 1990.

   c. The Court considered the Petitioner's sworn declaration, particularly paragraphs four through eight. The Court notes that Ms. Chandler chose the word "investment" in paragraph five, not the word "loan."

   d. The Court was informed that there is pending state court litigation regarding the obligation of the Alleged Debtor to pay the claim of Ms. Chandler.

   e. The Court considered the testimony of Ms. Chandler on cross-examination, regarding whether or not the funds advanced were received by the Alleged Debtor. Ms. Chandler could not effectively testify on that point.

45. After having received the testimony of Petitioner, Ms. Chandler, and having heard the testimony of Ronald Brotzman [7] and Mr. Perkins on the issue of Ms. Chandler's claim, the Court found that she did not carry her burden of proof. Her claim was not proved and it was clearly subject to a *bona fide* dispute.

46. Based on the foregoing, the Court found that there was substantial question as to whether Ms. Chandler advanced funds as a loan or an investment to the Alleged Debtor. There is also no evidence that the monies paid by Ms. Chandler were actually received by the Alleged Debtor. There is pending state court litigation which suggests that the claim of Ms. Chandler is contingent as well as subject to a *bona fide* dispute.

47. The Court found that Ms. Chandler was not a qualified petitioning creditor under 11 U.S.C. § 303(b). Thus, there were no qualified petitioning creditors in the case.

## VI. *DISMISSAL OF INVOLUNTARY PETITION*

48. At the conclusion of the Petitioners' case, the Alleged Debtor moved for a directed verdict. Directed verdicts are disfavored by the Court in general, except when there is good cause to grant same. This Court found, by the clear and compelling weight of evidence, that there was good cause to grant the directed verdict, and dismiss the Petitioners' Involuntary Petition.

49. The single remaining Petitioner had not proved that the Alleged Debtor was "generally not paying" its debts as they became due, which is the threshold requirement for an involuntary petition under 11 U.S.C. § 303(h)(1). The relevant evidence on that issue before the Court was (a) a list of creditors provided by the Alleged Debtor with its response to the Petition, (b) the testimony of Ronald Brotzman, and (c) the inconclusive and limited testimony of Ms. Chandler. While Mr. Brotzman testified that he had not been paid what he thought he was due, that testimony, coupled with Ms. Chandler's claim, in and of itself simply does not prove that the Alleged Debtor was "generally not paying its debts" as they became due (emphasis added).

50. Based on all the testimony and supporting evidence, the Court also concluded that the within involuntary bankruptcy Petition was merely a continuation, and an exacerbation, of the parties' other business disputes and pending state court litigation. Specifically, the Involuntary Petition was simply another vehicle, and an improper vehicle, for the ongoing disputes between Mr. Kelley and Mr. Harpin, on one side, and the Alleged Debtor and Mr. Perkins, on the other.

---

7. Mr. Brotzman was the Alleged Debtor's former attorney and a creditor of the Alleged Debtor. He was called as a witness by Mr. Moskowitz.

## VII. *BAD FAITH FILING*

51. The Alleged Debtor has made allegations that the Involuntary Petition was filed in bad faith and the Alleged Debtor has requested that this Court enter judgment for damages, costs, and legal fees incurred under 11 U.S.C. § 303(i).

52. This Court finds that the within Involuntary Petition was filed in bad faith; that conclusion is almost inescapable. This Involuntary Petition is the product of a business war and personal vendetta carried on primarily by Mr. Kelley and Mr. Harpin against this Alleged Debtor and its principal, Mr. Perkins.

53. The Court further concludes that, similar to the activities undertaken by Mr. Kelley and Mr. Harpin prior to the Involuntary Petition being filed, their activities, part of and related to this involuntary bankruptcy case, reflect a pattern of harassment, overreaching, uncompromising combativeness, intimidation, even deceit and threats.

54. The Court is convinced that by design and with purpose, the Petitioners, particularly Mr. Kelley in league with Mr. Harpin, knowingly and willfully pursued the involuntary bankruptcy Petition to settle financial disputes, and if necessary to prevail, to financially punish and injure the Alleged Debtor and its principal, Mr. Perkins. This proceeding is not the product of an isolated, perhaps inadvertent or misguided, effort to seek only legitimate legal redress.[8]

55. Mr. Kelley and Mr. Harpin have used the Involuntary Petition, or the bankruptcy option, in an improper and unacceptable way. It is a misuse, indeed an abuse, of the system.[9]

56. The above conclusions are drawn from the compelling weight of evidence referenced above and reinforced by either the following items of evidence or reasonable inferences drawn therefrom:

a. Of all the evidence submitted to the Court, the Court finds that the testimony of neither Mr. Harpin nor Mr. Kelley was credible.[10]

b. Since the filing of the Involuntary Petition and up to the day prior to the hearing on February 15, 1994, there was contact by Mr. Harpin with Mr. Perkins and even Mr. Flynn, in an attempt to ward off this Court's consideration of the Alleged Debtor's Motion to Dismiss. In particular, Mr. Harpin made a veiled threat to Mr. Flynn, trying to pressure him into not truthfully testifying. The Court finds the attempt unsuccessful and Mr. Flynn's testimony credible and compelling.

c. There is also an inference from the evidence that the Petitioners, or an agent, contacted some of the creditors disclosed on the creditor list filed by the Alleged Debtor, which contact was, in part, by way of anonymous mailings, perhaps intended to harm business relations of the Alleged Debtor. *See*, Alleged Debtor's Exhibit M.

d. Through Exhibits C, E, and F, it is evident that Mr. Kelley is quite capable of conducting his business or legal disputes through unusual and questionable tactics.

e. Mr. Kelley, apparently disregarding court rule and the instruction of the Honorable Charles E. Matheson in the Cimarron Ventures, Inc. bankruptcy case, filed the narrative which has been identified as Alleged Debtor's Exhibit E. In strong and direct terms, Judge

---

8. "With respect to 11 U.S.C. § 301(i), examples of bad faith include where the petition is ill advised or motivated by spite, malice or a desire to embarrass the debtor. 2 Collier on Bankruptcy ¶ 303.12 (15th ed. 1979). Whether a party acted in bad faith is essentially a question of fact." *Camelot, Inc. v. Hayden,* 30 B.R. 409, 411 (E.D.Tenn.1983).

9. "Here we are dealing with the efficacy of the bankruptcy system. A bad faith filing goes not only to [the petitioner's] filing of the involuntary petition, but also goes to the utilization of the entire bankruptcy system. It is distinguishable from a basic case where two parties are affected. Here, the unique involuntary bankruptcy machine is put in action which causes significant burdens and stigmata without the benefit of reorganization or discharge." *Matter of Salmon,* 128 B.R. 313 (Bankr.M.D.Fla.1991).

10. Indeed, at one time Mr. Harpin admitted that he had intentionally lied in a deposition taken by counsel for the Alleged Debtor in state court.

Matheson rejected the filing of such a document in Cimarron. It is a personal attack on the integrity and professionalism of Mr. Flynn. It is highly inappropriate. That memorandum, in substantially similar form, was allowed to be in the Court file for almost two weeks and therefore was available for public inspection as a document of this Court. The Court finds that this illustration of disregard for legal propriety is indicative of the lengths to which Petitioners and Mr. Harpin will evidently go.

57. In addition to the many different roles and relationships Mr. Harpin has to the parties and disputes herein, he testified that he has been the agent for collection of the promissory note, Petitioner's Exhibit A, upon which Ms. Chandler bases her claim, since the summer of 1992. The Court finds that the actions of Mr. Harpin, which have culminated in the bad faith filing of this Petition, are attributable, but only in small part, to Ms. Chandler as well.

58. The Court also believes, however, as admitted by Mr. Perkins, that Ms. Chandler's role has been secondary, essentially without malice, and largely induced and directed by business persons with far greater experience, sophistication, knowledge, and motivation, i.e., Mr. Kelley and Mr. Harpin. The "bad faith" conduct in this case undertaken by Ms. Chandler, if any, appears to be a mere fraction of that exhibited by Mr. Kelley and Mr. Harpin.

## VIII. COUNSEL'S ROLE IN FILING

59. On October 19, 1993, attorney for the Petitioning Creditors, Keith Moskowitz, telephoned counsel for the Alleged Debtor and threatened to file the Involuntary Petition if there was not a relinquishment of any and all claimed interest in the Creekside Partnership interests in proceeds from Woodbridge.

60. Mr. Moskowitz was advised by counsel for the Alleged Debtor that both Mr. Kelley and Ms. Chandler held contingent and disputed claims which therefore disqualified both Petitioners under 11 U.S.C. § 303. Despite this warning, Mr. Moskowitz caused the Petition to be filed.

61. Mr. Moskowitz did not provide evidence that he had, as counsel, made some independent, diligent inquiry to ascertain the propriety and validity of filing the Involuntary Petition under 11 U.S.C. § 303. On the other hand, had there been evidence that Mr. Moskowitz had engaged in diligent prefiling inquiry, then the Court could only conclude that he recklessly and cavalierly chose to ignore the evidence that these Petitioners' claims were subject to *bona fide* dispute and that the Involuntary Petition was otherwise groundless and unwarranted; that it was a mere continuation of the business wars between the parties.

62. It is also undisputed that Mr. Moskowitz participated in the maintenance of this involuntary action for five months in the face of available evidence that the Petition was being urged by Petitioners in bad faith and that neither Petitioner was qualified to act as a petitioner under 11 U.S.C. § 303. Despite that knowledge, it was with the continued help, professional advice, and counseling of Mr. Moskowitz that this Petition went to trial.[11]

63. Mr. Moskowitz has made statements "in his defense" or otherwise explaining his role in the course of these proceedings. The Court could not take those statements as sworn testimony, but received them as statements of an officer of the Court. The Court however, gave Mr. Moskowitz ample opportunity to present more extended testimony as to his position on the issue of his participation in the involuntary bankruptcy case which was claimed by the Alleged Debtor to be in bad faith. He declined to do so, except by argument.[12] So too, Mr. Kelley and Mr. Harpin, both of whom attended the entire

---

11. The evidence suggests that, perhaps, Mr. Moskowitz is capable of questionable litigation tactics, as well, one of which is alleged to be threats. *See,* Appendix A.

12. Mr. Moskowitz, among other things, appears to have involved himself in multiple, continuing "conflict" situations. This was, perhaps, one reason for declining to testify more elaborately and being subjected to cross-examination.

trial, did not offer rebuttal testimony on the issues of the alleged bad faith filing.

64. It is not insignificant that the original Involuntary Petition failed to justify entry of an order for relief on each of several separate and independent grounds.[13] The case was dismissed at the conclusion of Petitioners' case. This tends to reflect a more reckless, or otherwise unwarranted, filing of the Petition in the first place.

65. The request for relief against Mr. Moskowitz, as counsel for the Petitioners, is proper under statute, applicable case law, and Rule 9011, Fed.R.Bankr.P. *In re Exchange Network Corp.,* 85 B.R. 128, 131–133 (Bankr.D.Colo.1988). *See, M.E.N. Co. v. Control Fluidics, Inc.,* 834 F.2d 869, 873 (10th Cir.1987); *Matter of Baker,* 744 F.2d 1438 (10th Cir.1984); *see,* 28 U.S.C. § 1927; *Braley v. Campbell,* 832 F.2d 1504 (10th Cir. 1987).

## IX. *DAMAGES*

66. This Court, having dismissed the Involuntary Petition at trial, may grant judgment against the Petitioners for costs and reasonable attorney's fees, as provided in 11 U.S.C. § 303(i)(1)(A) and (B). Upon a finding of bad faith on the part of one or more of the Petitioners, the Court may enter an award of punitive damages as well as any damages proximately caused by such filing. *See,* 11 U.S.C. § 303(i)(2)(A) and (B). *See generally, Matter of Salmon,* 128 B.R. 313 (Bankr.M.D.Fla.1991); *In re Kearney,* 121 B.R. 642 (Bankr.M.D.Fla.1990); *Camelot, Inc. v. Hayden,* 30 B.R. 409 (E.D.Tenn.1983). Such damages under either 11 U.S.C. § 303(i)(1) or (2) may be allowed in the alternative or cumulatively. *In re Advance Press & Litho, Inc.,* 46 B.R. 700, 701 (Bankr. D.Colo.1984).

67. An award of punitive damages may enter whether or not there is proof of actual damages. *See,* 11 U.S.C. § 303(i)(2); *Advance Press & Litho, Inc., supra* at 706. *See also, In re Wavelength, Inc.,* 61 B.R. 614, 621 (9th Cir. BAP 1986).

68. The Alleged Debtor has requested damages and attorney fees. This Court has considered the applicable law:

> The statutory language is clear that costs and attorney's fees may be awarded to a proposed debtor, by the Court, if the petition is dismissed and circumstances warrant. It is discretionary with the Court. It is equally clear that actual and punitive damages, if any, may be awarded to a proposed debtor, but only upon a finding of bad faith. An award of actual damages thus is not discretionary with the Court. An award of costs, attorney's fees or damages, in any event, is not automatic. *In re Advance Press & Litho, Inc.,* 46 B.R. 700, 701 (Bankr.[D.]Colo.1984); *See, In re Walden,* 781 F.2d 1121 (5th Cir.1986); *In re Nordbrock,* 772 F.2d 397 (8th Cir.1985).

*In re Exchange Network Corp.,* 85 B.R. 128, 131 (Bankr.D.Colo.1988).

69. Based on this Court's finding that the Petition was filed in bad faith, an award of actual and/or punitive damages may be appropriate.

70. Attorney fees and costs incurred by the Alleged Debtor in connection with this case have been considered in the following context:

a. The Alleged Debtor has provided through counsel, Exhibit S, a detailed listing of attorney fees incurred in connection with this case. The fees accrue at a reasonable rate, $150.00 per hour. Mr. Perkins has testified that he is experienced with litigation and the retention of attorneys.

b. In response to questions, Mr. Perkins testified that he was familiar with the costs of legal representation and that he knew the bills incurred, as represented by Exhibit S, to be reasonable and utilized in connection with the pursuit of dismissal of this Involuntary Petition.

---

13. (a) Mr. Kelley's and Ms. Chandler's claims were, both, subject to *bona fide* dispute; (b) Ms. Chandler failed to carry her burden of proof; (c) there was virtually no evidence produced that the Alleged Debtor was "generally not paying such debts" as they became due; and (d) Ms. Chandler's debt was not proven to be "not contingent as to liability."

c. The Petitioners chose not to not present credible or persuasive evidence with which to contest the fees as reasonable. No objection has been filed, in this regard, with this Court. There was, for example, virtually no cross-examination on the issue of reasonableness of attorney fees.

d. This Court is capable of making its own evaluation of the reasonableness of fees and no expert testimony is required for this Court to determine how much in legal fees should be awarded. *Advance Press & Litho, Inc., supra* at 703. *See also, Wavelength, Inc., supra* at 621–622.

e. The Alleged Debtor has submitted additional fees incurred since the hearing on February 15 and 16, 1994. That document is labeled Alleged Debtor's Exhibit S–1. It is proper to award those fees as well.

71. The Court believes it is proper and fully justified to award costs and attorney fees to the Alleged Debtor.

72. The Court concludes that an award of fees and judgment should enter in the amount of $14,850.00 for attorney fees and $19.00 in costs, pursuant to 11 U.S.C. § 303(i)(1).

73. The Court finds that it is necessary to apportion the responsibility and control, and thus the liability for the filing of the within Involuntary Petition, among the Petitioners and their counsel. The Court should allocate costs and damages against those who are the most responsible for the litigation; the driving force(s) behind the Petition filing. To do so otherwise would be manifestly inequitable and an injustice.

74. "Imposition of costs and attorney's fees against the Petitioners requires an effort by the Court to ascribe responsibility for filing the Involuntary Petition [Citation omitted.] This is not unlike the task required when fees are assessed as sanctions under B.R. 9011 or 28 U.S.C. § 1927. [Citations omitted.]" *Exchange Network Corp., supra* at 132.

75. Based on the evidence adduced at trial and the conclusions of this Court, the (a) responsibility, (b) control, (c) degree of "bad faith conduct," and (d) level of knowledge and willfullness of the petitioning parties and, thus, the consequent liability, for attorney fees and actual damages will be apportioned as follows:

a. Mr. Kelley, 30%

b. Mr. Harpin, 30%

c. Ms. Chandler, 10%

d. Mr. Moskowitz, 30%

76. Actual damages incurred by the Alleged Debtor in connection with this case have been considered in the following context:

a. There is ample evidence to prove that the Alleged Debtor and its successor, Coastal, have suffered damages caused by the delay of the sale of lots at Centennial Ranch Estates because of the actions of the Petitioners and Mr. Harpin. There is persuasive, essentially undisputed, evidence for example, respecting the delay, risk, and loss of value, in development properties of the Alleged Debtor/Coastal, due to the extended litigation and this involuntary bankruptcy proceeding. There is also evidence that the Alleged Debtor is contractually obligated to seek such damages for and on behalf of Coastal, and to pay any funds awarded for such damages to Coastal. The Court finds that the pattern of conduct which led to the bad faith filing of the Involuntary Petition has resulted in the following damages and in accordance with 11 U.S.C. § 303(i)(2)(A), total damages are as follows:

i. Monthly interest payments on monies borrowed to keep Centennial Ranch Estates going during this case, at $1,700.00 per month as testified by Mr. Perkins. Said amount, from date of filing the Petition to entry of judgment, is $6,036.16, prorating the accrual of interest on a daily basis through date of entry of judgment.

ii. Damages of lost profits from NU-PUD of surrounding land. Mr. Perkins testified that he had ten transferable

densities which could be developed by Coastal, but for the problems caused by Petitioners and Mr. Harpin. That testimony was essentially unrefuted. By that testimony, it reasonably appears Coastal can now develop only five densities. That results in a probable net loss on the profit of five densities because of the filing of this Petition. Testimony indicated that each density has an average sale value of about $120,000.00 per unit. The costs of acquisition and development per unit is about $40,000.00.

b. With regard to development of the Alleged Debtor/Coastal's property, it is difficult to precisely and accurately allocate the specific sources of delay, title problems, increased credit risk, loss of business opportunity and ability to timely act, and related problems suffered by the Alleged Debtor/Coastal and their principal, Mr. Perkins. The two central sources are, for sure, however, a combination of (i) the Involuntary bankruptcy Petition, and (ii) the non-bankruptcy, state court litigation, and related business disputes and contests.

c. The Court finds the total, non-interest, costs and actual damages sustained by the combination of the two factors, (i) the Involuntary Petition and (ii) other state court litigation and related dis-

putes, to be $400,000.00. (See calculations, ¶ 76.a.ii.)

d. The Court finds the total, non-interest, costs and damages arising from and proximately caused by the involuntary bankruptcy filing, as distinguished from the remaining non-bankruptcy, state court litigation and related business disputes, to be one-half, or $200,000.00.

e. Accordingly, an award for total actual damages and judgment should enter in favor of the Alleged Debtor, and against Mr. Kelley, Ms. Chandler, Mr. Moskowitz, and Mr. Harpin in the total amount of $206,036.16.

77. An award of punitive damages against those persons who engineered and propelled this involuntary bankruptcy case—those who acted knowingly, willfully, and maliciously—is appropriate.[14]

78. The Court concludes that, based on the evidence at trial [15] and in conformity with the findings and conclusions recited in this Opinion, punitive damages in favor of the Alleged Debtor/Coastal and against the parties, or agents, to this action should be awarded as follows:

Robert A. Kelley    $75,000.00
Vernon J. Harpin    $75,000.00

For the reasons set forth above,

IT IS THEREFORE ORDERED as follows:

---

**14.** This is a finding made cognizant of, and consonant with, the burden of proof and test found in 11 U.S.C. § 523(a)(6).

[Alleged debtor's] assertion that sanctions under Section 303 as a result of [petitioner's] bad faith should be characterized as willful and malicious under Section 523(a)(6) is supported by Congressional intent. Congress clearly created a remedy for malicious prosecution in the form of a bad faith filing of an involuntary petition in bankruptcy. [Citation omitted.]

After reviewing the transcript of the hearing on the determination of [petitioner's] bad faith before Judge Paskay, this Court finds the facts elicited in [the alleged debtor's] involuntary case were sufficient not only to establish the bad faith of [petitioner] in filing the involuntary petition, but also to establish his acts were

equivalent to a willful and malicious injury to [the alleged debtor]. [Citation omitted.]
*Matter of Salmon*, 128 B.R. 313 (Bankr. M.D.Fla.1991).

**15.** The Court is not, however, specifically advised as to the particular financial resources and capability of these parties other than what can be gleaned from the record. Ms. Chandler is evidently a schoolteacher. Mr. Kelley is a sophisticated, skilled and experienced businessman who has been involved with, perhaps, several not insubstantial business and/or real estate development enterprises. Mr. Harpin is, likewise, an experienced businessman who specializes, or holds himself out to specialize, in financial matters.

1. The Petitioners' Involuntary Petition in bankruptcy is confirmed as DISMISSED at trial, February 15, 1994.

2. An award and judgment of costs in the amount of Nineteen Dollars ($19.00), and attorney fees in the amount of Fourteen Thousand Eight Hundred Fifty Dollars ($14,850.00), is hereby entered in favor of Oakley Custom Homes, Inc. against the two Petitioners, Catherine B. Chandler and Robert A. Kelley, and Vernon Jackson Harpin and Keith Moskowitz, in their respective, pro rata shares, as apportioned pursuant to paragraph 75 and as specified below:

| | |
|---|---|
| Robert A. Kelley | $ 4,460.70 |
| Vernon Jackson Harpin | $ 4,460.70 |
| Catherine B. Chandler | $ 1,486.90 |
| Keith Moskowitz | $ 4,460.70 |

3. An award and judgment of Two Hundred Six Thousand Thirty–Six Dollars and Sixteen Cents ($206,036.16) as and for actual damages, is hereby entered in favor of Oakley Custom Homes, Inc. against the two Petitioners, Catherine B. Chandler and Robert A. Kelley, and Vernon Jackson Harpin and Keith Moskowitz, in their respective, pro rata shares, as apportioned pursuant to paragraph 75 and as specified below:

| | |
|---|---|
| Robert A. Kelley | $61,810.85 |
| Vernon Jackson Harpin | $61,810.85 |
| Catherine B. Chandler | $20,603.61 |
| Keith Moskowitz | $61,810.85 |

4. An award and judgment, as and for punitive damages, is hereby entered in favor of Oakley Custom Homes, Inc. against each of the following individuals in the amount specified below:

| | |
|---|---|
| Robert A. Kelley | $75,000.00 |
| Vernon Jackson Harpin | $75,000.00 |

## APPENDIX A

(Testimony of Gary Flynn; Transcript of February 15, 1994 Hearing)

Q How long have you been licensed to practice law?

A Since 1985.

Page 2, Lines 18–19.

Q So have you in the course of your career then represented Cimarron Ventures, Inc. as its attorney?

A Yes, I have. I was its Chapter 11 bankruptcy counsel.

Page 3, Lines 16–18.

A They stated that there really wasn't anything to fear from Mr. Perkins because Mr. Perkins was at that time involved with the Centennial property in North Boulder, and they were quite aware of his desperate financial situation....

Page 5, Lines 21–24.

A They had the money and the wherewithal and the stomach, frankly, to ride that out and drain him of any monies that he may have at that point and ruin him. And they really didn't have much concern about Mr. Perkins, that he would eventually have to go away because he simply didn't have the money to keep up with them.

Q What do you mean ruin him?

A Ruin him, ruin, take the Centennial property, because I think at that point they stated that that was the only source of income he had at the time, and that it was their intention to keep him busy in litigation, to drain him, because Mr. Kelley would fund the operation and eventually he would dry up and have to—he'd have to basically cut whatever deal they were going to put to him because he'd have no alternative.

Page 6, Lines 6–19.

Q I mean, they would shrug it off, just keep on chugging and ultimately, you know, they're just going to—you know, they're going to crush him, they're going to ruin him, they're going to drain

him financially and he'll have no choice. He won't be able to pay attorneys to keep on fighting.

Page 8, Lines 17–22.

A Yes, at the conclusion of the hearing on September 28th, 1993, Judge Matheson bound the motion to appoint an independent trustee for the Cimarron Ventures case over to a trial on November 10th, 1993, and upon the judge exiting the bench, Mr. Moskowitz turned to me and said, "This means your life."

Page 13, Lines 16–21.

Q Other than that threat, had Mr. Harpin ever made any threats to you?

A Yes.

Page 14, Lines 8–10.

A And then the threats started coming; that he and Mr. Kelley, he and Rob don't think I'm going to live to see that hearing November 10th.

Page 15, Lines 6–8.

A And he kept on going with his threats about how they were going to ruin my career and sue me and tie me up and then again, "We don't think you're going to live to see that hearing on November 10th."

Page 15, Lines 10–13.

A And then about 20 minutes into the discussion, it turned to, "We'll, Rob and I are thinking about hiring someone to kill you."

Page 15, Lines 19–21.